# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ALASKA RIGHT TO LIFE COMMITTEE,
        *Plaintiff-Appellant,*

        v.

BROOKE MILES; ANDREA JACOBSON;
LARRY WOOD; MARK HANDLEY;
JOHN DAPCEVICH; SHEILA
GALLAGHAER,

        *Defendants-Appellees.*

No. 04-35599

D.C. No.
CV-02-00274-A-
RRB

OPINION

Appeal from the United States District Court
for the District of Alaska
Ralph R. Beistline, District Judge, Presiding

Argued and Submitted
July 12, 2005—Anchorage, Alaska

Filed March 22, 2006

Before: Alfred T. Goodwin, Melvin Brunetti, and William
A. Fletcher, Circuit Judges.

Opinion by Judge William A. Fletcher

**COUNSEL**

Kenneth P. Jacobus, Anchorage, Alaska, Richard E. Coleson and James Bopp, Jr., Bopp Coleson & Bostrom, Terre Haute, Indiana, for the plaintiff-appellant.

Michael G. Mitchell, Office of the Alaska Attorney General, Anchorage, Alaska, for the defendants-appellees.

**OPINION**

W. FLETCHER, Circuit Judge:

Alaska Right to Life Committee ("AKRTL") challenges certain aspects of Alaska's campaign finance law, Alaska Stat. § 15.13.030 *et seq.* Prior to the 2002 Alaska gubernatorial election, AKRTL was informed by the Alaska Public Offices Commission that if it wished to engage in "electioneering communications" as a "nongroup entity," it would have to comply with registration, reporting, notification, and disclosure-of-identity requirements. AKRTL brought suit in federal district court based on the First Amendment, seeking declaratory and injunctive relief against these requirements. On cross-motions for summary judgment, the district court upheld the Alaska law. We affirm.

## I. Factual and Procedural Background

AKRTL is a nonprofit corporation headquartered in Anchorage, Alaska. It describes itself as "a membership-

based association that seeks to promote its pro-life perspective to the Alaska public." It describes its major purpose as promoting "a pro-life consensus in Alaska's public through the presentation of its pro life message." It seeks to accomplish its goals through various forms of communication to the public, including a newsletter, telemarketing, and the Internet. AKRTL states that it is not affiliated with any political party, political candidate, or campaign committee.

AKRTL is affiliated with the Alaska Right to Life Political Action Committee ("AKRTL-PAC") and Alaska Right to Life, Inc. ("AKRTL Inc."). AKRTL-PAC is an advocacy organization, and AKRTL Inc. is a tax-exempt educational organization. The three entities share the same director and the same board of directors. The degree of financial separation among the three entities is unclear from the record. AKRTL-PAC is registered as a "group" with the Alaska Public Offices Commission ("APOC"), which interprets and enforces Alaska's campaign finance disclosure law. AKRTL is not registered.

Fundraising by AKRTL is primarily accomplished through telemarketing campaigns. In 2002, AKRTL developed a proposed telemarketing campaign costing more than $500 (the monetary threshold under Alaska law) that would mention candidates' names; discuss political issues that were relevant to the then-upcoming gubernatorial election on November 5, 2002; and state the candidates' position on those issues. Specific language that AKRTL planned to use in the campaign was as follows:

> Alaska Right to Life is always on the forefront of implementing pro-life legislation within our state, such as banning partial birth abortion, establishing parental consent and stopping state funding. We believe these are important issues affecting all Alaskans. Frank Murkowski supports Alaska Right to Life's pro-life vision by supporting a ban on partial

birth abortion, establishing parental consent and stopping state funding. But Fran Ulmer stands in opposition to these measures. Please be sure to vote.

Frank Murkowski and Fran Ulmer were, respectively, the Republican and Democratic candidates for governor in 2002.

In late September 2002, the Indiana-based lawyer now representing AKRTL made general telephone inquiries to APOC concerning Alaska's campaign finance law without revealing the identity of his client. The same lawyer made two later inquiries, again without identifying his client. Finally, on November 1, 2002, local Alaska counsel provided a draft complaint, signed by AKRTL Inc., to the Alaska Attorney General's office. The local counsel indicated that he planned to file the complaint the next day. The draft complaint asked for a temporary restraining order allowing AKRTL Inc. to engage in a telemarketing campaign prior to the November 5, 2002 election using the above-quoted language.

APOC responded by telephone and letter. The letter, dated November 1, noted that "AkRTL" (by which it appears to have meant AKRTL-PAC) had already registered under the Alaska statute. The letter also noted that the fundraising was intended to benefit "the committee" (by which it appears to have meant AKRTL). APOC approved the proposed communication on the assumption that AKRTL-PAC, which had previously registered with APOC as a "group," would be the entity making the telephone calls. APOC specified that "because the script includes an electioneering communication, the costs must be paid for with group-reported funds."

AKRTL Inc. did not file its proposed complaint on November 2. Instead, on November 4, AKRTL — not AKRTL Inc. or AKRTL-PAC — filed suit in federal district court, naming as defendants Brook Miles, Andrea Jacobson, Larry Wood, Mark Handley, John Dapcevich, and Sheila Gallagher in their official capacities as director and members of APOC (collec-

tively "APOC"). As noted above, AKRTL (unlike AKRTL-PAC) has not registered under Alaska's campaign finance law.

AKRTL challenged five provisions of the Alaska law: (1) the definition of "electioneering communication"; (2) the requirement that it register before making campaign finance expenditures; (3) the requirement that it make reports; (4) the requirement that it notify contributors and potential contributors that their contributions may be used to influence an election; and (5) the requirement that it disclose in its communications who is paying for the communication. AKRTL contended that these provisions violate the First Amendment both facially and as applied.

The district court granted summary judgment to APOC. AKRTL appealed everything except the district court's approval of the notification requirement for contributors (issue (4), above). We have jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1291. We affirm.

## II.   Statutory Background

Alaska has a long history of regulating political influence and campaign finance, beginning in 1913 when the Alaska legislature passed a statute requiring lobbyists to register. 1913 Alaska Sess. Law ch. 43 § 1 (1913). In 1974, Alaska adopted a law limiting individual contributions to candidates, limiting the amount of money candidates could spend, and requiring that written receipts for all expenditures promoting candidates that exceeded $100 be filed with the state election commission. 1974 Alaska Sess. Law ch. 76 § 1 (1974).

A 1990 report commissioned by the Alaska State Senate revealed that public confidence and trust in the integrity of the legislature was " 'disturbingly low' " and that this was attributable in part to " 'calculated evasions of the purpose and spirit of campaign laws.' " *Alaska v. Alaska Civil Liberties*

*Union* ("*AKCLU*"), 978 P.2d 597, 602 (Alaska 1999) (quoting the report). A former member of the State House of Representatives stated that "[t]he constant refrain I heard from citizens . . . was that the Legislature was owned by special interests [and] that nothing was going to change the corruption caused by big money." *Id.* (internal quotation marks omitted).

In 1996, Alaska passed a comprehensive campaign reform statute, commonly referred to as SB 191. SB 191 contained a finding that "the purpose of this Act [is] to substantially revise Alaska's election campaign finance laws in order to restore the public's trust in the electoral process and to foster good government." Alaska Sess. Law ch. 48 § 1. Under SB 191, independent expenditures by an entity supporting or opposing a candidate for state office were banned unless the entity qualified as a "group." *AKCLU*, 978 P.2d at 607-08. A "group" was defined as "any combination of two or more individuals acting jointly who organize for the principal purpose of influencing the outcome of one or more elections and who take action the major purpose of which is to influence the outcome of an election." *Id.* at 608 n.65. All entities not qualifying as "groups" were banned from making such independent expenditures.

In 1999, the Supreme Court of Alaska upheld most of SB 191 in *AKCLU*. The court upheld the ban on expenditures by what it called "nongroup entities," but only after defining that term narrowly. Guided by the United States Supreme Court's decisions in *Federal Election Commission v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238 (1986), and *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990), the Alaska court defined "nongroup entities" as "organizations potentially able to amass great wealth through state-created advantages." *AKCLU*, 978 P.2d at 611-12. Included in the court's definition of "nongroup entities" were corporations and labor unions. 978 P.2d at 607-08. Excluded from its definition were entities that "(1) . . . cannot participate in business activities, (2) . . . have no shareholders who have a claim on

corporate earnings, and (3) . . . are independent from the influence of business corporations." The court held that "nongroup entities," so defined, could constitutionally be banned from making independent expenditures to support or oppose candidates. *Id.* at 612. Entities excluded from the court's definition of "nongroup entities" were not banned by the statute from making such expenditures. *Id.* at 611-12.

A separate challenge to SB 191 was brought in federal district court. The district court stayed proceedings until the Alaska Supreme Court decided *AKCLU*. After that decision became final, the district court ruled on the constitutionality of two provisions of SB 191 that had not been addressed in *AKCLU*. *Jacobus v. State of Alaska*, 182 F. Supp. 2d 881 (D. Alaska 2001). The district court struck down a $5,000 per year limitation on "soft-money" contributions by individuals to political parties, as well as a limitation on professional services volunteered by individuals on behalf of a candidate or ballot proposition when the services were those for which that individual "would ordinarily be paid a fee or wage." *Id.* at 885, 890. On appeal, we upheld the statutory limitation on "soft money" contributions, but struck down the limitation on individual volunteer services. *Jacobus v. State of Alaska*, 338 F.3d 1095, 1107-22, 1122-25 (9th Cir. 2003).

Partly in response to the decisions by the Alaska Supreme Court in *AKCLU* and the federal district court in *Jacobus*, the Alaska legislature significantly amended Alaska's campaign finance law in 2001 and 2002. Preventing corruption and the appearance of corruption, as well as providing information to voters, were cited by various members of the State legislature as compelling interests supporting the amendments. As Representative Jeanette James stated during debates on the amendments, the primary focus of campaign finance laws is to inform the public, and that "wherever there is money involved in affecting policy in the State, either by law or by choice, the public has a right to know."

Among other things, the 2001 and 2002 amendments extended various disclosure requirements to "nongroup entities." As a result, "nongroup entities" became subject to the same disclosure rules as "groups."

The amendments also provided a broad definition of "electioneering communication," thereby closing a loophole that had allowed evasion of disclosure requirements if the use of certain, specified words was avoided in advertisements. This new broad definition was influenced by our description of the "magic words requirement," and its associated problems, in *Federal Election Commission v. Furgatch*, 807 F.2d 857, 863 (9th Cir. 1987):

> A test requiring the magic words "elect," "support," etc., or their nearly perfect synonyms for a finding of express advocacy would preserve the First Amendment right of unfettered expression only at the expense of eviscerating the Federal Election Campaign Act. "Independent" campaign spenders working on behalf of candidates could remain just beyond the reach of the Act by avoiding certain key words while conveying a message that is unmistakably directed to the election or defeat of a named candidate.

Finally, and somewhat confusingly, the amendments essentially adopted as their definition of "nongroup entities" the Alaska Supreme Court's description in *AKCLU* of entities that had been excluded from that court's definition of "nongroup entities" in SB 191. Under *AKCLU*, "nongroup entities" were defined to include only organizations, such as business corporations and labor unions, that were capable of "amassing great wealth" through state-created advantages. "Nongroup entities," so defined, were banned by SB 191 from making independent expenditures. Other entities — neither "groups" nor "nongroup entities" — were permitted to make independent expenditures under SB 191. Now, under the new amend-

ments, those *other* entities were called "nongroup entities." Under the newly adopted Alaska Stat. § 15.13.400(13),

> "nongroup entity" means a person, other than an individual, that takes action the major purpose of which is to influence the outcome of an election, and that
>
> > (A)   cannot participate in business activities;
> >
> > (B)   does not have shareholders who have a claim on corporate earnings; and
> >
> > (C)   is independent from the influence of business corporations.

A "nongroup entity" under the newly adopted amendments is not banned from making expenditures. "Nongroup entities" are merely required to make various forms of disclosure in connection with their expenditures.

AKRTL's First Amendment challenge is addressed to disclosures now required of "nongroup entities" that make expenditures.

### III.   Mootness

**[1]** AKRTL's suit is not moot simply because the 2002 election has come and gone. We have held that "election cases often fall within the 'capable of repetition, yet evading review' exception to the mootness doctrine, because the inherently brief duration of an election is almost invariably too short to enable full litigation on the merits." *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1095 n.4 (9th Cir. 2003) (quoting *Porter v. Jones*, 319 F.3d 483, 490 (9th Cir. 2003)) (internal quotation marks and alterations omitted). The provisions of Alaska law challenged by AKRTL remain in

place, and there is sufficient likelihood that AKRTL will again be required to comply with them that its appeal is not moot.

## IV. Standard of Review

We review the district court's grant of summary judgment de novo. *See Buono v. Norton*, 371 F.3d 543, 545 (9th Cir. 2004). Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.*

## V. Discussion

On appeal to this court, AKRTL argues that it cannot be required to make disclosures as a condition of making "expenditures" for "electioneering communications" as those terms are defined under Alaska Stat. §§ 15.13.400(3), (5) and (6). The centerpiece of AKRTL's First Amendment challenge is its argument that the definition of "electioneering communications" is unconstitutionally vague and overbroad. In addition, AKRTL challenges three specific disclosure requirements. First, it challenges the requirement that a "nongroup entity" register under Alaska Stat. § 15.13.050(a) before it can make an "expenditure" under Alaska Stat. § 15.13.067. Second, it challenges the requirement that a nongroup entity report expenditures under Alaska Stat. §§ 15.13.040(d), (e), and (j), 15.13.074(i), 15.13.082(b), 15.13.100, and 15.13.135(a). Third, it challenges the requirement that a nongroup entity disclose under Alaska Stat. §§ 15.13.090 and 15.13.135(b) that it is paying for a communication.

None of the challenged provisions limits the amount of money a nongroup entity such as AKRTL may spend. Rather, the provisions require only that certain forms of disclosure be made. With that in mind, we consider AKRTL's challenges.

A.    Definition of "Electioneering Communications"

As a result of the 2001 and 2002 amendments, "nongroup entities" are required to make disclosures in connection with their "expenditures." For example, a nongroup entity "making an expenditure" must register with APOC as required by § 15.13.050; a nongroup entity making an expenditure is required to make a "full report" of that expenditure under § 15.13.040(d); a nongroup entity is prohibited by § 15.13.067 from making "an expenditure in an election for candidates for elective office" unless it has registered with APOC; a nongroup entity may not make an expenditure unless the source of the expenditure has been disclosed as required by § 15.13.082(b); and a nongroup entity making an "independent expenditure" supporting or opposing a candidate for election to public office is required by § 15.13.135(b) to disclose the source of the expenditure.

An "expenditure" is defined as the transfer of anything of value for the purpose of making "an express communication" or "an electioneering communication." Alaska Stat. § 15.13.400(6)(A) and (C). An "expenditure" does *not* include the transfer of something of value for making "an issues communication." *Id.* at § 15.13.400(6)(C).[1]

---

[1]The syntax of the statute is somewhat garbled. The text provides as follows:

(6)    *"expenditure"*

(A)    *means a purchase or a transfer of money or anything of value, or promise or agreement to purchase or transfer money or anything of value, incurred or made for the purpose of*

(i) influencing the nomination or election of a candidate or of any individual who files for nomination at a later date and becomes a candidate;

(ii) use by a political party;

(iii) the payment by a person other than a candidate or political party of compensation for the personal services of

The various forms of "communication" referred to in the section defining "expenditure" are defined as follows:

> "[C]ommunication" means an announcement or advertisement disseminated through print or broadcast media, including radio, television, cable, and satellite, the Internet, or through a mass mailing, excluding those placed by an individual or nongroup entity and costing $500 or less and those that do not directly or indirectly identify a candidate or proposition, as that term is defined in AS 15.13.065(c)[.]

*Id.* at § 15.13.400(3).

> "[E]xpress communication" means a communication that, when read as a whole and with limited reference to outside events, is susceptible of no other reasonable interpretation but as an exhortation to vote for or against a specific candidate[.]

*Id.* at § 15.13.400(7).

> "[E]lectioneering communication" means a communication that
>
>> (A)   directly or indirectly identifies a candidate;

---

>> another person that are rendered to a candidate or political party; or
>>
>> (iv) influencing the outcome of a ballet proposition or question;
>
> (B)   does not include a candidate's filing fee or the cost of preparing reports and statements required by this chapter;
>
> (C)   *includes an express communication and an electioneering communication, but does not include an issues communication*[.]

Alaska Stat. § 15.13.400(6) (emphasis added).

    (B)   addresses an issue of national, state, or local political importance and attributes a position on that issue to the candidate identified; and

    (C)   occurs within the 30 days preceding a general or municipal election[.]

*Id.* at § 15.13.400(5).

"[I]ssues communication" means a communication that

    (A)   directly or indirectly identifies a candidate and

    (B)   addresses an issue of national, state, or local political importance and does not support or oppose a candidate for election to public office[.]

*Id.* at § 15.13.400(12).

**[2]** AKRTL argues that the definition of "electioneering communication" is unconstitutionally vague and overbroad, both on its face and as applied. The Alaska definition of "electioneering communication" is comparable to the definition of the same term in the federal Bipartisan Campaign Reform Act of 2002 ("BCRA"). "Electioneering communication" is defined under BCRA as any "broadcast, cable, or satellite communication" that

    (I) refers to a clearly identified candidate for Federal office:

    (II)   is made within —

(aa)   60 days before a general, special, or runoff election for the office sought by the candidate; or

(bb)   30 days before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate, for the office sought by the candidate; and

(III)   in the case of a communication which refers to a candidate for an office other than President or Vice President, is targeted to the relevant electorate.

2 U.S.C. § 434(f)(3)(A)(i). A communication is "targeted to the relevant electorate" if it "can be received by 50,000 or more persons" in the congressional district or state. *Id.* at § 434(f)(3)(C).

The definition of "electioneering communication" under Alaska law is different from the federal definition of that same term in the following respects. First, under Alaska law, the communication must identify a candidate for office "directly or indirectly." Under the federal law, the communication must identify a candidate "clearly." Second, under Alaska law, the communication must "address[ ] an issue of national, state or local political importance," and must "attribute[ ] a position on that issue to the candidate." Under federal law, the content of the communication is not specified; however, with the exception of communications referring to candidates for the Presidency and the Vice-Presidency, the communication must be "targeted to the relevant electorate." Third, under Alaska law, the communication must occur within 30 days of any general or municipal election. Under federal law, the communication must occur within 60 days of a general or comparable election, or within 30 days of a primary or comparable election.

### 1. Vagueness

We have little trouble concluding that the definition of "electioneering communication" contained in § 15.13.400(15) is not unconstitutionally vague, either facially or as applied. In *McConnell v. Federal Election Commission*, 540 U.S. 93 (2003), the Supreme Court upheld the federal definition of "electioneering communication" in BCRA against a facial vagueness challenge. The Court did not merely uphold the definition as constitutionally permissible; indeed, because the definition was so obviously constitutional, the Court also did not narrow the definition by judicial construction in order to avoid a constitutional question. The Court wrote:

> [W]e observe that [the] definition of "electioneering communication" raises none of the vagueness concerns that drove our analysis in *Buckley* [*v. Valeo*, 424 U.S. 1 (1976)]. The term "electioneering communication" applies only (1) to a broadcast (2) clearly identifying a candidate for federal office, (3) aired within a specific time period, and (4) targeted to an identified audience of at least 50,000 viewers or listeners. These components are both easily understood and objectively determinable. Thus, the constitutional objection that persuaded the Court in *Buckley* to limit FECA's reach to express advocacy is simply inapposite here.

540 U.S. at 194 (internal citations omitted).

From the standpoint of vagueness, there are only two possibly significant differences between the federal and the Alaska definition of "electioneering communication." First, under the federal definition, the candidate must be identified "clearly." By contrast, under the Alaska definition, the candidate must be identified "directly or indirectly." Second, under the federal definition, the content of the communication is not described beyond what might be implicit in the requirement

that the communication be "targeted to the relevant elector-ate." By contrast, under the Alaska definition, the communi-cation must "address[ ] an issue of national, state, or local political importance and attribute[ ] a position on that issue to the candidate identified." We take these two differences in turn.

### a.   Facial Challenge to Candidate Identification

AKRTL argues that the definition of "electioneering com-munication" is unconstitutionally vague on its face because the candidate must be identified "directly or indirectly" rather than "clearly," as in the federal definition. Specifically, AKRTL argues that the use of the word "indirectly" is consti-tutionally fatal. We disagree.

[3] The federal and the Alaska definitions operate in the same way. Under both definitions, if the candidate is identi-fied by the communication, it is an "electioneering communi-cation." Under both definitions, it does not matter how the identification of the candidate takes place. The federal defini-tion specifies no method of identification. The Alaska defini-tion specifies that the method may be direct or indirect; however, since the words "direct and indirect" together describe the complete universe of possible methods of identi-fication, the Alaska statute has the actual effect of requiring no specific method of identification, just like the federal defi-nition.

If the Alaska definition had only used the word "directly," omitting the word "indirectly," it would have left open the possibility that a communication identifying a candidate would have escaped regulation. As we stated in rejecting the "magic words" approach in our opinion in *Furgatch*,

> A proper understanding of the speaker's message can best be obtained by considering speech as a whole. Comprehension often requires inferences

from the relation of one part of speech to another. The entirety may give a clear impression that is never succinctly stated in a single phrase or sentence.

807 F.2d at 863.

**[4]** The Alaska legislature chose two words — "directly" and "indirectly" — that in combination were well suited to its purpose of regulating campaign communications identifying particular candidates. "Indirectly" is an easily understood word in common English usage. In the context in which it is used, it is neither vague nor difficult to understand. We therefore reject AKRTL's facial vagueness challenge to the definition of "electioneering communication."

### b.   Facial Challenge to Requirement That the Communication "Address[ ] an Issue of National, State, or Local Political Importance"

The Alaska definition of "electioneering communication" requires that the communication "address an issue of national, state, or local political importance." AKRTL argues that this provision of the Alaska's definition is unconstitutionally vague on its face. We disagree.

**[5]** The challenged provision restricts the scope of the definition so that it covers only certain kinds of communication. By comparison, the only restriction in the federal definition is that the communication be "targeted to the relevant electorate." The Supreme Court in *McConnell* upheld the federal definition against a vagueness challenge, despite the failure to describe the content of an "electioneering communication" except for whatever description might be implicit in the phrase "relevant electorate." In our view, "relevant," as used in the federal definition, is at least as vague a term as the phrase "addresses an issue of national, state, or local political importance," as used in the Alaska definition. In context, the

requirement in the federal definition that the communication be targeted to the "relevant electorate" pretty clearly means that the communication must concern some issue of political importance to that electorate. But, of course, "issue" and "political importance" are precisely the words used in the Alaska statute. Those words are accompanied by the words "national, state, or local," but, if anything, those words make the provision less rather than more vague.

### c.   As-Applied Vagueness Challenge

**[6]** We also reject AKRTL's as-applied vagueness challenge. An "electioneering communication" as defined under Alaska law, clearly applies to AKRTL's proposed telephone message. That proposed message specifically identifies, by name, the 2002 Republican and Democratic gubernatorial candidates, Frank Murkowski and Fran Ulmer. AKRTL's proposed communication also clearly addresses an issue of "national, state, or local political importance." Indeed, the proposed communication itself refers to the issues of "banning partial birth abortion, establishing parental consent and stopping state funding," and then states, "We believe these are important issues affecting all Alaskans."

### 2.   Overbreadth

We also have little trouble concluding that the definition of "electioneering communication" is not unconstitutionally overbroad. AKRTL argues that the definition of "electioneering communication" is not restricted to "express advocacy" or its functional equivalent, and that "electioneering communication" under Alaska law can be interpreted to include "issue advocacy." AKRTL further argues that if the definition of "electioneering communication" includes "issue advocacy," the definition is unconstitutionally overbroad. We disagree.

### a.   Facial Overbreadth

AKRTL's argument is based on the Supreme Court's analysis of the Federal Election Campaign Act of 1971 in *Buckley*

*v. Valeo*, 424 U.S. 1 (1976). In *Buckley*, the Court construed a provision of the Act that limited expenditures "relative to a clearly identified candidate" to $1,000 per year. 18 U.S.C. § 608(e)(1) (1970 ed., Supp. IV). Influenced by the First Amendment, the Court construed that provision to apply only to "expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office." 424 U.S. at 44. Employing what have later been called "magic words," the Court noted that the limitation on expenditures applied only to expenditures for communications "containing express words of advocacy of election or defeat, such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject.' " *Id.* at 44 n.52.

In *McConnell*, the Supreme Court retreated from its statements in *Buckley*. Plaintiffs in *McConnell* challenged the federal definition of "electioneering communication" in BCRA, arguing "that *Buckley* drew a constitutionally mandated line between express advocacy and so-called issue advocacy, and that speakers possess an invaluable First Amendment right to engage in the latter category of speech." 540 U.S. at 190. The Court in *McConnell* emphasized that the distinction drawn in *Buckley* between "express advocacy" and "so-called issue advocacy" was not constitutionally compelled, but was rather "the product of statutory interpretation rather than a constitutional command." *Id.* at 192. "In short, the concept of express advocacy and the concomitant class of magic words were born of an effort to avoid constitutional infirmities." *Id.*

Despite the Court's retreat from *Buckley* in *McConnell*, AKRTL argues that Alaska's definition of "electioneering communications" is overbroad because it includes "issue advocacy." We disagree for two reasons.

**[7]** First, AKRTL is incorrect in arguing that "issue advocacy" is included in the Alaska definition of "electioneering communications." Under Alaska's law, "electioneering com-

munications" have a distinct and non-overlapping definition from "issues communications." The disclosure requirements to which AKRTL objects are triggered only by an expenditure that supports an "express communication" or an "electioneering communication." Alaska Stat. § 15.13.400(6)(C). The disclosure requirement is *not* triggered by an expenditure that supports an "issues communication." *Id.* The statute states explicitly, "[E]xpenditure" . . . includes an express communication and an electioneering communication, *but does not include an issues communication.*" *Id.* (emphasis added).

**[8]** Under the Alaska law, an "issues communication" is defined as "a communication that (A) directly or indirectly identifies a candidate; and (B) addresses an issue of national, state, or local political importance *and does not support or oppose a candidate* for election to public office." *Id.* at § 15.13.400(12) (emphasis added). This definition of "issues communication" is fully consistent with *Buckley*'s definition of "issues advocacy." Even if we were to agree with AKRTL's argument that issue advocacy cannot constitutionally come within the definition of "electioneering communication," we would be compelled by the plain words of the Alaska statute to conclude that "issue advocacy" is not included within that definition.

**[9]** Second, as the Supreme Court noted in *McConnell*, the line between express and issues advocacy is, in any event, not constitutionally compelled. In construing the federal definition of "electioneering communication" under BCRA, the Court upheld the constitutionality of the definition without applying the *Buckley* distinction between the two kinds of advocacy. The Court wrote:

> Nor are we persuaded . . . that the First Amendment erects a rigid barrier between express advocacy and so-called issue advocacy. That notion cannot be squared with our longstanding recognition that the presence or absence of magic words cannot mean-

ingfully distinguish electioneering speech from a
true issue ad. . . . Not only can advertisers easily
evade the line by eschewing the use of magic words,
but they would seldom choose to use such words
even if permitted. And although the resulting adver-
tisements do not urge the viewer to vote for or
against a candidate in so many words, they are no
less clearly intended to influence the election. *Buck-
ley*'s express advocacy line, in short, has not aided
the legislative effort to combat real or apparent cor-
ruption, and Congress enacted BCRA to correct the
flaws in the existing system.

540 U.S. at 193-94 (footnote omitted); *see also ACLU of Nev.
v. Heller*, 378 F.3d 979, 985 (9th Cir. 2004) ("After *McCon-
nell*, the line between 'express' and all other election-related
speech is not constitutionally material[.]").

#### b.   Overbreadth as Applied

**[10]** Alaska's definition of "electioneering communica-
tions" as applied to AKRTL's proposed telephone message is
not unconstitutionally overbroad as applied to AKRTL's pro-
posed telephone message. That proposed message refers to
several issues concerning abortion, ascribes positions on those
issues to the two gubernatorial candidates, and urges the lis-
tener to vote. Under any reasonable understanding of that
message, the listener is being urged to vote for or against
these two candidates based on the positions described in the
message. Such a message is clearly regulable under both
*Buckley* and *McConnell*.

### B.   Disclosure Requirements

AKRTL challenges three different kind of disclosures that
a "nongroup entity" must make if it wishes to make an "elec-
tioneering communication." First, the entity must register
with APOC. Second, the entity must report expenditures.

Third, the entity must disclose that it is paying for its communications.

AKRTL argues that these disclosure requirements violate its First Amendment rights. In part its argument depends on its contention — which we have just rejected — that the definition of "electioneering communication" is unconstitutionally vague and overbroad. But in part its argument depends on a free-standing contention that because it is an "*MCFL* organization," as described in *Federal Election Commission v. Massachusetts Citizens for Life*, 479 U.S. 238 (1986) ("*MCFL*"), it is protected by the First Amendment from having to make such disclosures.

We agree with AKRTL that it is a "nongroup entity" under Alaska law, and that such an entity is an *MCFL* organization. We also agree that *MCFL* organizations have greater protections under the First Amendment than traditional business corporations. However, we disagree with AKRTL's contention that Alaska's disclosure requirements violate the First Amendment rights of an *MCFL* organization.

### 1.  *MCFL* Organizations

We begin our analysis with a description of the Supreme Court's holding in *MCFL*. Massachusetts Citizens for Life, Inc. ("MCFL"), a nonprofit, nonstock corporation, brought a First Amendment challenge to a provision of the Federal Election Campaign Act of 1974, 2 U.S.C. § 441b. Section 441b imposed certain requirements on all corporations making expenditures "in connection with" any federal election. Among other things, § 441b required that campaign expenditures not come from money in the corporation's general fund. Instead, such expenditures had to come from a separate, segregated fund. The money in that fund could come only from voluntary contributions "earmarked for that purpose by the donors." *Id.* at 252.

In its majority opinion, the Court distinguished between a "traditional corporatio[n] organized for economic gain" and a corporation like MCFL. *Id.* at 259. In the Court's view, a traditional corporation — an "organization that amass[es] great wealth in the marketplace," *id.* at 263 — may be regulated to a greater extent. The Court defined a corporation like MCFL as having three critical features: First, it "was formed for the express purpose of promoting political ideas, and cannot engage in business activities." Second, it has no shareholders or other affiliated persons with "a claim on assets or earnings." Third, it "was not established as a business corporation or labor union, and it is its policy not to accept contributions from such organizations." *Id.* at 263-64.

The Court majority in *MCFL* construed § 441b to apply only to expenditures and contributions for "express advocacy." *Id.* at 249. It then held that an organization meeting the above criteria could not constitutionally be required to maintain a separate, segregated fund containing money specifically solicited for campaign contributions. It wrote, "The limitation on solicitation in this case . . . means that nonmember corporations can hardly raise any funds at all to engage in political speech warranting the highest constitutional protection." *Id.* at 260. The Court held that the limitation contained in § 441b could not be constitutionally applied to corporations meeting the *MCFL* criteria because it was too "broad [a] prophylactic rule." *Id.*

The Federal Election Commission ("FEC") had advanced two primary justifications for applying § 441b to *MCFL*. First, the FEC had argued that MCFL-type organizations might use an individual's money for purposes not supported by that individual. It contended that "even if contributors may be aware that a contribution to appellee will be used for political purposes in general, they may not wish such money to be used for electoral campaigns in particular." *Id.* at 261. The Court majority responded by noting that this concern could be met "by means far more narrowly tailored and less burden-

some," simply by "requiring that contributors be informed that their money may be used for such a purpose." *Id.* Second, the FEC had argued that if the requirements of § 441b were not applicable to MCFL, this "would open the door to massive undisclosed political spending by similar entities, and to their use as conduits for undisclosed spending by business corporations and unions." *Id.* at 262. The majority responded by noting that whatever interest the government had in disclosure was satisfied by another, unchallenged provision of the statute under which MCFL was required to report information about independent expenditures "of as little as $200." *Id.* The Court therefore concluded that the FEC had not advanced a "*compelling* state interest" sufficient to justify the application of § 441b to MCFL. *Id.* at 263 (emphasis in original).

## 2.  Degree of Scrutiny

The degree of scrutiny that we must apply to Alaska's disclosure requirements for "nongroup entities" is somewhat unclear. In *Buckley*, the Court applied "exacting scrutiny" to various disclosure requirements in the Federal Election Campaign Act, including disclosures of contributions as small as $11 or $101 to minor-party and independent candidates, and disclosures "by those who make independent contributions and expenditures." *Buckley*, 424 U.S. at 61-62; *see also id.* at 44-45 ("[T]he constitutionality of § 608(e)(1) turns on whether the governmental interests advanced in its support satisfy the *exacting scrutiny* applicable to limitations on core First Amendment rights of political expression." (emphasis added)). "Exacting scrutiny," in the words of *Buckley*, required that a " 'substantial relation' " be shown "between the governmental interest and the information required to be disclosed." *Id.* at 64. This "exacting scrutiny" standard in *Buckley* was later characterized by the Court as requiring that a restriction on corporate political expenditures be "narrowly tailored to serve a compelling state interest." *Austin*, 494 U.S. at 657 (citing *Buckley*, 424 U.S. at 44-45).

In *McConnell*, the Court appears to have relaxed the degree of scrutiny. It explicitly applied a less exacting scrutiny to campaign contributions. It wrote:

> Because the electoral process is the very means through which a free society democratically translates political speech into concrete governmental action, contribution limits, like other measures aimed at protecting the integrity of the process, tangibly benefit public participation in political debate. For that reason, when reviewing Congress' decision to enact contribution limits, there is no place for a strong presumption against constitutionality, of the sort often thought to accompany the words "strict scrutiny."

540 U.S. at 137 (internal quotation marks and citations omitted). The Court was not as explicit about the appropriate standard of scrutiny with respect to disclosure requirements. However, in addressing extensive reporting requirements applicable to money gathered and disbursed to finance "electioneering communications" (as that term is defined in BCRA), the Court did not apply "strict scrutiny" or require a "compelling state interest." *See id.* at 194-95 (describing disclosure requirements). Rather, the Court upheld the disclosure requirements as supported merely by "important state interests." *Id.* at 196 ("We agree with the District Court that the *important state interests* that prompted the *Buckley* Court to uphold FECA's disclosure requirements . . . apply in full to BCRA." (emphasis added)). In the Court's view, those "important state interests" "amply support[ed] application of [the] disclosure requirements to the entire range of 'electioneering communications.' " *Id.*

In our recent opinion in *Heller*, relying on *McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995), we applied strict scrutiny in deciding a facial challenge to a state law requiring "persons paying for or 'responsible for paying for' the publi-

cation of 'any material or information relating to an election candidate or any question on a ballot' to identify their names and addresses on 'any [published] printed or written matter or any photograph.' " 378 F.3d at 981-82. We noted that *McConnell* "casts new light" on some aspects of First Amendment protections of election-related speech, but we concluded that "nothing in *McConnell* undermines *McIntyre*'s understanding that proscribing the *content* of an election communication is a form of regulation of campaign activity subject to traditional strict scrutiny." *Id.* at 987.

**[11]** In some respects, the disclosure requirements in the case now before us resemble the disclosure requirements at issue in *McConnell*. In other respects — in particular the requirements of Alaska Stat. §§ 15.13.090 and 15.13.135(b) that the identity of a person paying for a "communication" be disclosed — they resemble those at issue in *Heller*. For purposes of this opinion we will assume without deciding that strict scrutiny applies to all of the challenged disclosure requirements, and that Alaska must advance a "compelling state interest" to justify them. Even under this standard, we hold that Alaska's disclosure requirements are justified.

### 3. Three Forms of Required Disclosure

The three forms of challenged disclosure are registration, reporting, and disclosure of who is paying for a communication. We first address AKRTL's facial challenge. We then address its as-applied challenge.

### a. Facial Challenge to Disclosure Requirements

### i. Registration

A nongroup entity must comply with the registration requirements of Alaska Stat. §§ 15.13.050(a) and 15.13.067 before it can make an expenditure in support of or in opposition to a political candidate. Section 15.13.050(a) provides:

> Before making an expenditure in support of or in opposition to a candidate . . . each person other than an individual shall register, on forms provided by the commission, with the commission.

The registration form provided by APOC in connection with § 15.13.050(a) is two pages long. It asks for basic information, such as a nongroup entity's name, its purpose, the names and contact information of its officers, its campaign plans, and banking information if it plans to raise more than $5,000.

Section 15.13.067 provides:

> Only the following may make an expenditure in an election for candidates for elective office:
>
> > (1)  the candidate;
> >
> > (2)  an individual;
> >
> > (3)  a group that has registered under AS 15.13.050; and
> >
> > (4)  a nongroup entity that has registered under AS 15.13.050.

The provision of this section covering a nongroup entity was added to the Alaska campaign finance law as part of the 2001 and 2002 amendments.

The registration requirements of Alaska Stat. §§ 15.13.040(a) and 15.13.167 are not significantly burdensome in themselves. They are only burdensome to the extent that they trigger the reporting and disclosure-of-who-is-paying requirements applicable once a nongroup entity has registered. We therefore postpone our consideration of burdens, and the state's justification for imposing them, to our consideration of these requirements.

### ii.   Reporting

AKRTL challenges the following reporting requirements with which a nongroup entity must comply once it has registered.

First, AKRTL challenges Alaska Stat. §§ 15.13.040(d), (e), and (j),[2] which require a nongroup entity making an expendi-

---

[2]The full text of § 15.13.040(d), (e), and (j) is as follows:

(d)   Every individual, person, nongroup entity, or group making an expenditure shall make a full report of expenditures, upon a form prescribed by the commission, unless exempt from reporting. (e) The report required under (d) of this section must contain the name, address, principal occupation, and employer of the individual filing the report, and an itemized list of expenditures. The report shall be filed with the commission no later than 10 days after the expenditure is made.

. . .

(j)   Except as provided in (l) of this section [setting forth reporting requirements when fund-raising nets contributions under $50 each], each nongroup entity shall make a full report in accordance with AS 15.13.110 upon a form prescribed by the commission and certified by the nongroup entity's treasurer, listing

(1)   the name and address of each officer and director of the nongroup entity;

(2)   the aggregate amount of all contributions made to the nongroup entity for the purpose of influencing the outcome of an election;

(3)   for all contributions described in (2) of this subsection, the name, address, date, and amount contributed by each contributor and, for all contributions described in (2) of this subsection in excess of $250 in the aggregate during a calendar year, the principal occupation and employer of the contributor; and

(4)   the date and amount of all contributions made by the nongroup entity, and, except as provided for certain independent expenditures in AS 15.13.135(a), all expenditures made, incurred, or authorized by the nongroup entity, for the pur-

ture to make a "full report" of that expenditure on a form pro-
vided by APOC no later than ten days after the expenditure
is made. The report must contain the name, address, principal
occupation, and employer of the individual filing the report,
and an "itemized list" of expenditures (§ 15.13.040(c) and
(d)). Further, a nongroup entity must make a "full report," at
intervals prescribed by § 15.13.110, listing the name and
address of each officer and director of the entity
(§ 15.13.040(j)(1)); the aggregate amount of all contributions
made to the entity for the purpose of influencing the outcome
of the election (§ 15.13.040(j)(2)); the name, address, date,
and amount contributed by each contributor to the entity, and,
for contributions by a particular contributor exceeding an
aggregate of $250 in any calendar year, the principal occupa-
tion and employer of that contributor (§ 15.13.040(j)(3)); and
the date and amount of all contributions made by the entity,
and, except for certain independent expenditures, all expendi-
tures made by the entity for the purpose of influencing the
outcome of an election (§ 15.13.040(j)(4)).

Second, AKRTL challenges Alaska Stat. § 15.13.074(i),
which requires a nongroup entity to notify a potential contrib-
utor of the purpose to which his contribution may be used if
that contribution is to be to influence the outcome of an elec-
tion.

---

pose of influencing the outcome of an election; a nongroup
entity shall report contributions made to a different nongroup
entity for the purpose of influencing the outcome of an elec-
tion and expenditures made on behalf of a different nongroup
entity for the purpose of influencing the outcome of an elec-
tion as soon as the total contributions and expenditures to
that nongroup entity for the purpose of influencing the out-
come of an election reach $500 in a year and for all subse-
quent contributions and expenditures to that nongroup entity
in a year whenever the total contributions and expenditures
to that nongroup entity for the purpose of influencing the
outcome of an election that have not been reported under this
paragraph reach $500.

Third, AKRTL challenges Alaska Stat. § 15.13.082(b), which provides that a "nongroup entity may not make an expenditure unless the source of the expenditure has been disclosed by this chapter."

Fourth, AKRTL challenges Alaska Stat. § 15.13.110,[3] which specifies the deadlines for filing reports with APOC.

---

[3]In relevant part, the text of § 15.13.110 provides:

(a) Each candidate, group, and nongroup entity shall make a full report in accordance with AS 15.13.040 for the period ending three days before the due date of the report and beginning on the last day covered by the most recent previous report. If the report is a first report, it must cover the period from the beginning of the campaign to the date three days before the due date of the report. If the report is a report due February 15, it must cover the period beginning on the last day covered by the most recent previous report or on the day that the campaign started, whichever is later, and ending on February 1 of that year. The report shall be filed

    (1) 30 days before the election; however, this report is not required if the deadline for filing a nominating petition or declaration of candidacy is within 30 days of the election;

    (2) one week before the election;

    (3) 105 days after a special election; and

    (4) February 15 for expenditures made and contributions received that were not reported previously . . . .

(b) Each contribution that exceeds $250 and that is made within nine days of the election shall be reported to the commission by date, amount, and contributor within 24 hours of receipt by the candidate, group, campaign treasurer, or deputy campaign treasurer. Each contribution to a nongroup entity for the purpose of influencing the outcome of an election that exceeds $250 and that is made within nine days of the election shall be reported to the commission by date, amount, and contributor within 24 hours of receipt by the nongroup entity.

. . .

(f) During the year in which the election is scheduled, each of the following shall file the campaign disclosure reports in the manner and at the times required by this section:

Finally, AKRTL challenges Alaska Stat. § 15.13.135(a),**⁴** which requires a nongroup entity making an independent expenditure supporting or opposing a candidate to make reports under Alaska Stat. §§ 15.13.040 and 15.13.110, provided that the entity's annual operating budget is more than $150.

**[12]** We conclude that these reporting requirements survive strict scrutiny. In *Buckley*, the Court wrote that in determining whether a state's interests in regulating campaign contributions and expenditures "are sufficient to justify the requirements we must look to the extent of the burden that they place on individual rights." 424 U.S. at 68. For several reasons, we believe that the burdens imposed on nongroup entities by these requirements are not particularly onerous.

**[13]** First, the challenged provisions require only reporting of contributions to, and of contributions and expenditures by, a nongroup entity. The provisions in no way limit the amount that may be contributed to, or spent by, the entity.

**[14]** Second, unlike the provisions at issue in *MCLF*, the

---

. . .

(4)   a group or nongroup entity that receives contributions or makes expenditures on behalf of or in opposition to a person described in (1)-(3) of this subsection [e.g., an individual running for governor][.]

**⁴**The full text of § 15.13.135(a) is as follows:

Only an individual, group, or nongroup entity may make an independent expenditure supporting or opposing a candidate for election to public office. An independent expenditure supporting or opposing a candidate for election to public office, except an independent expenditure made by a nongroup entity with an annual operating budget of $250 or less, shall be reported in accordance with AS 15.13.040 and 15.13.100-15.13.110 and other requirements of this chapter.

challenged provisions do not "mean that [nongroup entities] can hardly raise any funds at all to engage in political speech[.]" *MCLF*, 479 U.S. at 260. There is no allegation in this case that the reporting provisions limit the fundraising ability of nongroup entities.

**[15]** Third, unlike the provisions at issue in *MCLF*, the challenged provisions are not "broad prophylactic rule[s]" that require structural changes in a nongroup entity, such as the segregated fund requirement imposed by § 441b of the Federal Election Campaign Act of 1974. *Id.* at 260. Instead, the challenged provisions are very much like those that the Court suggested in *MCLF* as alternative means by which Congress could permissibly accomplish its aims. For example, Alaska Stat. § 15.13.074(i) requires a nongroup entity to notify a potential contributor of the political purpose to which his contribution may be used. This provision corresponds almost exactly to the Court's suggestion in *MCLF* that Congress could "requir[e] that contributors be informed that their money may be used for [electoral campaigns]." *Id.* at 261. Further, the reporting requirements of Alaska Stat. §§ 15.13.040(d), (e) and (j), 15.13.082(b), 15.13.110, and 15.13.135(a) are very much the like the unchallenged reporting requirements in *MCLF*. The Court in *MCLF* pointed to those requirements as accomplishing the aims of Congress more precisely than the "broad prophylactic rule" of § 441b that it held unconstitutional. *Id.* at 262.

**[16]** In light of the nature of the burdens imposed on a nongroup entity by Alaska's registration and reporting requirements, we hold that these requirements are justified by compelling state interests. As stated by the Court in *Buckley*, those interests are, first, providing "the electorate with information as to where political campaign money comes from and how it is spent . . . in order to aid the voters in evaluating those who seek . . . office"; second, "deter[ring] actual corruption and avoid[ing] the appearance of corruption by exposing large contributors and expenditures to the light of publicity";

and, third, imposing "recordkeeping, reporting, and disclosure requirements [as] an essential means of gathering the data necessary to detect violations" of the campaign finance law. *Buckley*, 424 U.S. at 66-68 (internal quotation marks omitted). Or, as stated more succinctly by the Court in *McConnell*, those interests are "providing the electorate with information, deterring actual corruption and avoiding any appearance thereof, and gathering the data necessary to enforce more substantive electioneering restrictions." *McConnell*, 540 U.S. at 196.

[17] We therefore hold that the reporting provisions of Alaska Stat. §§ 15.13.040(d), (e), (j), 15.13.074(i), 15.13.082(b), 15.13.110, and 15.13.135(a) are constitutional.

### iii. Disclosure of Who Pays for a Communication

Once registered, a nongroup entity must also comply with two provisions requiring that it disclose who is paying for a communication. AKRTL challenges both provisions.

First, Alaska Stat. § 15.13.090 requires that most campaign communications be accompanied by a statement indicating who financed the communication. Specifically, it provides:

> (a) All communications shall be clearly identified by the words "paid for by" followed by the name and address of the candidate, group, nongroup entity, or individual paying for the communication. In addition, candidates and groups may identify the name of their campaign chairperson.

> (b) The provisions of (a) of this section do not apply when the communication

>> (1) is paid for by an individual acting independently of any group or nongroup

entity and independently of any other individual;

(2)  is made to influence the outcome of a ballot proposition as that term is defined by AS 15.13.065(c); and

(3)  is made for

(A)  a billboard or sign; or

(B)  printed material other than an advertisement made in a newspaper or other periodical.

As defined by § 15.13.400(3), a "communication" means an "announcement or advertisement" that "directly or indirectly identif[ies] a candidate or proposition[.]"

Second, Alaska Stat. § 15.13.135(b) requires much the same kind of disclosure as § 15.13.090 for "independent expenditures." Specifically, it provides:

(b)  An individual, group, or nongroup entity who makes independent expenditures for a mass mailing, for distribution of campaign literature of any sort, for a television, radio, newspaper, or magazine advertisement, or any other communication that supports or opposes a candidate for election to public office

(1)  shall comply with AS 15.13.090; and

(2)  shall place the following statement in the mailing, literature, advertisement, or other communication so that it is readily and easily discernible:

This NOTICE TO VOTERS is required by Alaska law. (I/we) certify that this

(mailing/literature/advertisement) is not authorized, paid for, or approved by the candidate.

**[18]** In effect, both provisions require that voters be informed of the source and nature of funding for campaign communications. Section 15.13.090 requires, with certain specified exceptions, that communications be accompanied by such information. Section 15.13.135(b) requires that, in addition to complying with § 15.13.090, communications supporting a candidate paid for by independent expenditures must notify voters that the candidate did not authorize or pay for the communication.

AKRTL does not argue that Alaska Stat. §§ 15.13.090 and 15.13.135(b) require disclosures for communications whose anonymity is protected under *McIntyre*, 514 U.S. 334 (1995), and *Heller*, 378 F.3d 979 (9th Cir. 2004). AKRTL's challenge is quite narrow. It only argues that to the degree disclosure of its identity is required for "issue advocacy" communications or their "functional equivalent," there is no compelling state interest that would justify such a requirement. We disagree for two reasons.

First, as discussed above, the Court held in *McConnell* that the line drawn in *Buckley* between express and issue advocacy is not constitutionally compelled. Second, even if there were some relevant protection of issue advocacy, and even if disclosures of the nongroup entity's identity were required in connection with such issue advocacy, there is a compelling state interest justifying such a requirement.

**[19]** Leaving aside *McIntyre*-type communications which are not implicated by the Alaska law, we believe that there is a compelling state interest in informing voters who or what entity is trying to persuade them to vote in a certain way. The Court in *McConnell* quoted approvingly from the opinion of the district court in justifying a requirement in BCRA that the

identity of a corporation or labor union funding "purported 'issue ads' " be disclosed to the voters. The district court had written,

> Plaintiffs [who object to the disclosure requirement] never satisfactorily answer the question of how "uninhibited, robust, and wide-open" speech can occur when organizations hide themselves from the scrutiny of the voting public . . . . Plaintiffs' argument for striking down BCRA's disclosure provisions does not reinforce the precious First Amendment values that Plaintiffs argue are trampled by BCRA, but ignores the competing First Amendment interests in individual citizens seeking to make informed choices in the political marketplace.

540 U.S. at 197 (quoting *McConnell v. Fed. Election Comm'n*, 251 F.Supp.2d 176, 237 (D.D.C. 2003)). We understand the reasons given by the Court in *MCFL* for differentiating between corporations and labor unions, on the one hand, and so-called MCFL organizations, on the other, when substantial burdens on raising or spending money for political speech are at issue. But we do not believe that those reasons apply when disclosure of the entity funding a campaign communication is at issue. "[I]ndividual citizens seeking to make informed choices in the political marketplace," *id.*, have an equal need to know what entity is funding a communication, whether that entity is a corporation, a labor union, or a "nongroup entity" as defined under Alaska law.

**[20]** We therefore conclude that the compelling state interests of "providing the electorate with information, deterring actual corruption and avoiding any appearance thereof, and gathering the data necessary to enforce more substantive electioneering restrictions," *McConnell*, 540 U.S. at 196, justify the application of Alaska Stat. §§ 15.13.090 and 15.13.135(b) to nongroup entities.

### b. As-Applied Challenge to Disclosure Requirements

**[21]** In *McConnell*, the Court rejected plaintiffs' as-applied challenges to disclosure requirements in BCRA because the plaintiffs had not presented evidence in the district court establishing the "requisite 'reasonable probability' of harm" to persons making the required disclosures. 540 U.S. at 199. In this case, as in *McConnell*, AKRTL has not shown a " 'reasonable probability' of harm," in the sense intended in *McConnell*, as a result of its being required to make the disclosures required under the Alaska campaign law. We therefore reject its as-applied challenge.

## VI. Conclusion

For the foregoing reasons, we conclude that the challenged provisions of Alaska's campaign finance law are constitutional, both facially and as applied to AKRTL. We therefore AFFIRM the decision of the district court.

**AFFIRMED.**