# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

HUMAN LIFE OF WASHINGTON INC.,
       *Plaintiff-Appellant,*

v.

CHAIR BILL BRUMSICKLE; VICE
CHAIR KEN SCHELLBERG; SECRETARY
DAVE SEABROOK; JANE NOLAND; JIM
CLEMENTS, in their Official
Capacities as Officers and
Members of the Washington State
Public Disclosure Commission;
ROB MCKENNA, in His Official
Capacity as Washington Attorney
General,
       *Defendants-Appellees.*

No. 09-35128

D.C. No.
2:08-cv-00590-JCC

OPINION

Appeal from the United States District Court
for the Western District of Washington
John C. Coughenour, District Judge, Presiding

Argued and Submitted
May 7, 2010—Seattle, Washington

Filed October 12, 2010

Before: Kim McLane Wardlaw and Ronald M. Gould,
Circuit Judges, and James Ware, District Judge.*

Opinion by Judge Wardlaw

*The Honorable James Ware, United States District Judge for the
Northern District of California, sitting by designation.

17101

---

**COUNSEL**

John J. White, Jr. of Livengood, Fitzgerald & Alskog, PLLC (Kirkland, Washington) for the appellant.

James Bopp, Jr. (argued), Richard E. Coleson, Jeffrey P. Gallant, and Clayton J. Callen of Bopp, Coleson & Bostrom (Terre Haute, Indiana) for the appellant.

Robert M. McKenna, Linda A. Dalton, Gordon P. Karg, and Nancy J. Krier (argued) of the State of Washington (Olympia, Washington ) for the appellee.

J. Gerald Hebert, Paul S. Ryan, and Tara Malloy of the Campaign Legal Center (Washington, DC) as amicus curiae.

---

**OPINION**

WARDLAW, Circuit Judge:

> "[T]he people in our democracy are entrusted with the responsibility for judging and evaluating the relative merits of conflicting arguments. They may consider, in making their judgment, the source and credibility of the advocate."
>
> — *First National Bank v. Bellotti*, 435 U.S. 765, 791-92 (1978) (footnotes omitted)

Human Life of Washington ("Human Life"), a nonprofit, pro-life advocacy corporation, appeals the district court's denial of summary judgment in its suit against various Washington state officials.[1] Human Life challenges, on First Amendment grounds, Washington state's Public Disclosure Law ("Disclosure Law"), enacted as part of its campaign finance regulation. The Supreme Court recently concluded that the government "may regulate corporate political speech through disclaimer and disclosure requirements, but it may not suppress that speech altogether." *Citizens United v. FEC*, 130 S. Ct. 876, 886 (2010). Based on this principle, and for many of the same reasons articulated by the well-reasoned opinion of the district court, we too conclude that Washington State's disclosure requirements do not violate the First Amendment, either facially or as applied to Human Life and its proposed campaign to educate voters about the dangers of physician-assisted suicide in connection with a ballot measure that would legalize the practice.

## I.   BACKGROUND

### A.   Human Life of Washington and Initiative 1000

In 2008, Washington voters were asked to consider a ballot initiative, Initiative 1000, which would "permit terminally ill, competent, adult Washington residents medically predicted to die within six months to request and self-administer lethal medication prescribed by a physician." Wash. Initiative Measure No. 1000 (2008). The measure quickly spawned an "emotionally charged battle" between its advocates and its opponents. Associated Press, *Washington State Battles over Vote to Allow Lethal Meds for Dying Patients*, Oct. 11, 2008;

---

[1]The named officials are Bill Brumsickle, Ken Schellberg, Dave Seabrook, Jane Noland, and Jim Clements, in their official capacities as officers and members of the Washington State Public Disclosure Commission, and Rob McKenna, in his official capacity as Washington Attorney General (collectively, with the state of Washington, "Washington State").

*see also* John Iwasaki, *"Playing God" or Dignified Death? Faith Based Groups Taking Crucial Role in Initiative Battle*, Seattle Post-Intelligencer, Oct. 13, 2008 ("On their respective Web sites, the campaigns for and against Initiative 1000 include point-by-point attempts to debunk the other side in the debate over physician-assisted suicide, the contentious end-of-life issue facing Washington voters in the general election.").

Human Life opposed Initiative 1000, consistent with its mission to "reestablish throughout our culture, the recognition that all beings of human origin are persons endowed with intrinsic dignity and the inalienable right to life from conception to natural death." In pursuit of this goal, Human Life engages in "educational, legislative, and judicial efforts" to "seek reform in our culture's understanding." Over the years, Human Life has expended considerable time and resources opposing efforts to legalize physician-assisted suicide in Washington. For example, in 1991, Human Life and its affiliated political action committee, HLPAC, actively participated in the successful campaign to defeat Initiative 119, which would have amended Washington's constitution to legalize physician-assisted suicide. In 2008, on the day that Initiative 1000 was filed, Human Life issued a "special report" in an attempt to prevent the initiative from receiving a sufficient number of signatures to qualify for the ballot. Urging readers to "ENCOURAGE OTHERS NOT TO SIGN THE INITIATIVE," the report stated: "One would hope that it would deeply trouble the conscience of anyone inclined to sign this initiative petition, knowing they are signing some else's death warrant."

With physician-assisted suicide back on the ballot in 2008, Human Life undertook plans to solicit funds for and launch a public education campaign. As Human Life explained in its verified complaint, filed April 16, 2008,

> The year 2008 is an especially vital time for HLW
> to address the physician-assisted suicide issue

> because people again will be unusually attentive as it swirls to the forefront of public attention. . . . The physician-assisted suicide issue is in people's focus because former Governor Booth Gardner filed the proposed I-1000 with the Secretary of State on January 9, 2008, with qualifying signatures due by July 3, 2008.

Human Life's planned educational campaign consisted of three proposed public communications, as well as "substantially similar activities" that had not yet been identified.

First, Human Life would distribute a solicitation letter via email, regular mail, and its website. The proposed letter, which did not expressly mention Initiative 1000, opened: "The assisted suicide issue just won't go away. But neither will we. We are here to argue the prolife side on your behalf. However, as this grisly issue heats up again in 2008, Human Life of Washington needs your help to pay for some radio ads to educate the public." It went on to recount the defeat of the 1991 ballot initiative, to draw parallels between mid-19th century slavery abolitionists and modern-day pro-life advocates, and to discuss a study by a palliative-care specialist in Scotland, which it asserted "shows that problems with Oregon's assisted suicide scheme are real." In closing, the letter requested a donation to fund Human Life's public education campaign, stating that "[t]he public needs to receive this sort of information as assisted suicide advocates once again offer biased, inaccurate, and rosy depictions of this grisly practice."

Second, in addition to sending letters, Human Life intended to target individual voters by telephone. After introducing themselves as callers on behalf of Human Life, callers would read from a proposed script, alluding to Initiative 1000. The scripts read:

> Right now we are trying to reach every pro-life household in Washington with an urgent update. As

you've probably heard, former Governor Booth Gardner is trying to get an initiative on the ballot this fall that would legalize physician-assisted suicide in the State of Washington. We fear that many Washingtonians do not know the grisly facts about physician-assisted-suicide and its devastating effect on a culture of life.

Callers then would solicit financial contributions to Human Life's public education and advocacy activities.

Finally, Human Life intended to broadcast radio advertisements. It developed four proposed scripts for thirty-second radio spots. In one, a male voice would say, "Some people think that persons with disabilities don't have lives worth living," to which a female voice would respond, "Like Nazi docs!" In another proposed radio spot, the speaker would note that "[a]ssisted suicide is back in the news" and would go on to summarize results from a study about assisted suicide in Oregon. A third proposed advertisement would feature a male voice warning that physician-assisted suicide is a "slippery slope" because "people who *can't* consent — like babies — are being killed." Finally, in a fourth proposed radio spot, a speaker would warn that assisted suicide "turns doctors into killers." None of the proposed advertisements would expressly mention Initiative 1000, and each would end with a disclosure that the advertisement was sponsored by Human Life.

Human Life's educational campaign never got off the ground, however, because Human Life feared that its proposed communications would subject it to the requirements of Washington's Disclosure Law, a law that Human Life contends violates its First Amendment rights.

### B.   Washington's Public Disclosure Law

The Disclosure Law was enacted by ballot initiative in 1972, with the support of 72% of the voting public. It declares

as Washington state's public policy "[t]hat political campaign and lobbying contributions and expenditures be fully disclosed to the public and that secrecy is to be avoided." Wash. Rev. Code § 42.17.010(1). It also states as Washington's public policy that "full access to information concerning the conduct of government on every level must be assured as a fundamental and necessary precondition to the sound governance of a free society." *Id.* § 42.17.010(11). Under the Disclosure Law, this policy is implemented through detailed reporting, registration, and disclosure requirements (collectively, "disclosure requirements"), which are administered and enforced by Washington's Public Disclosure Commission (the "Commission"), a bipartisan citizen's commission whose five members are appointed by the governor and confirmed by the state senate.

According to the Commission's Executive Director, the Disclosure Law "enables the public to 'follow the money' with respect to campaigns and lobbying" by providing for the collection of informational forms, which become public record. These forms are now electronically available in searchable format through the Commission's website. The Commission's Chief Technology Officer reports that its website receives approximately 14,000 visitors per month. In addition, the media uses financial data in its reporting. *See, e.g.*, Richard Roesler, *I-1000 Advocates Raking It In*, Spokesman-Review, Apr. 30, 2008; Susan Gilmore, *How Money Talks on Initiatives*, Seattle Times, Nov. 22, 2004. As well as gathering data and reports, the Commission provides the public with aggregate data, analysis, and summaries in its biennial "Election Financing Fact Book."

At issue in this appeal are two aspects of the Disclosure Law: (1) the requirements imposed on "political committees" and (2) the requirements for "independent expenditures" and "political advertising." These provisions do not place a limit on expenditures for advocacy; rather, they require only that covered entities make certain public disclosures.

### 1.  Political Committees

The Disclosure Law defines a "political committee" as "any person (except a candidate or individual dealing with his or her own funds or property) having the expectation of receiving contributions or making expenditures in support of, or opposition to, any candidate or any ballot proposition." Wash. Rev. Code § 42.17.020(39). As construed by Washington courts, this definition "sets forth two alternative prongs under which an individual or organization may become a political committee and subject to the Act's reporting requirements." *Evergreen Freedom Found. v. Wash. Educ. Ass'n*, 49 P.3d 894, 902 (Wash. Ct. App. 2002). Under the prong at issue here — the "expenditures" prong — "a person or organization may become a political committee by . . . expecting to make or making expenditures to further electoral political goals." *Id.* at 902-03. This definition has been narrowed by judicial construction to cover only an organization that has as its "primary or one of the primary purposes" to "affect, directly or indirectly, governmental decision making by supporting or opposing candidates or ballot propositions." *Id.* at 903 (quoting *State v. Dan J. Evans Campaign Comm.*, 546 P.2d 75, 79 (Wash. 1976)).

A group's designation as a "political committee" triggers various disclosure requirements. First, all political committees must appoint a treasurer and open a bank account in the state of Washington. *See* Wash. Rev. Code § 42.17.050(1). In addition, they must register with the Commission by filing a two-page Political Committee Registration Form, which contains information required by the Disclosure Law. This information includes the committee's name and address; the names and addresses of related and affiliated committees and persons; the names, addresses, and titles of the committee's officers and any persons authorized to make expenditures for the committee; a statement of whether the organization is a continuing one (i.e., whether it was established in anticipation of any election campaign in particular); the ballot proposition or can-

didate that the committee supports or opposes; how surplus funds will be distributed in the event of dissolution; and the name, address, and title of anyone who works for the committee to perform ministerial functions. *See id.* § 42.17.040.

Filing the registration form is the sole requirement imposed on political committees that raise or spend less than $5,000 in a year and that raise no more than $500 from any single donor. Wash. Admin. Code § 390-16-105(2); *see also* Wash. Rev. Code § 42.17.370(8) (authorizing the Commission to relieve political committees of certain reporting obligations). Political committees that exceed these limits must submit various additional reports to the Commission. *See* Wash. Rev. Code §§ 42.17.080, 42.17.090. First, monthly reports are required if the political committee "has received a contribution or made an expenditure in the preceding calendar month and either the total contributions received or total expenditures made since the last such report exceeds two thousand dollars." *Id.* § 42.17.080(2)(c). Second, a political committee must file periodic reports on certain dates relative to the election at issue: (1) the twenty-first day before an election, (2) the seventh day before an election, and (3) the tenth day of the first month after an election. *Id.* § 42.17.080(2)(a)-(b). Each periodic report must include an accounting of the political committee's "funds on hand" at the beginning of the reporting period, including "[t]he surplus or deficit of contributions over expenditures"; the source and amount of contributions received; the source and amount of any loans to be used for the political committee's benefit; and the identity of "each candidate or political committee to which any transfer of funds was made, together with the amounts and dates of such transfers." *Id.* § 42.17.090(1).

## 2.   Independent Expenditures and Political Advertising

An entity not subject to the disclosure requirements governing political committees may be required nonetheless to disclose    certain    information    about    its    "independent

expenditures" and "political advertising." For example, a corporation that does not qualify as a political committee because of its relatively limited involvement in political advocacy might, prior to a particular election, decide to spend money on a series of radio advertisements criticizing a candidate whose views the corporation considers inimical to its business interests. *See Citizens United*, 130 S. Ct. at 913 (holding that corporations have a First Amendment right to make independent expenditures). Under the Disclosure Law, the corporation might be subject to disclosure requirements associated with this activity even though the corporation does not qualify as a political committee.

An "independent expenditure" is "any expenditure that is made in support of or in opposition to any candidate or ballot proposition and is not otherwise required to be reported." Wash. Rev. Code § 42.17.100(1). Disclosure requirements are triggered if, in a given election, such an expenditure equals more than $100 or if its value cannot reasonably be estimated. *Id.* § 42.17.100(2). If an expenditure crosses this valuation threshold, an entity must submit "an initial report of all independent expenditures made during the campaign" up until that point in time. *Id.* The required two-page report must include the name and address of the person filing the report; the name and address of each person to whom an independent expenditure was made in the aggregate amount of more than fifty dollars; the amount, date, and purpose of each such expenditure; and the total sum of all independent expenditures made during the campaign. *Id.* § 42.17.100(5). After submitting the initial report, the regulated entity must submit monthly update reports, but this requirement applies only if "the reporting person has made an independent expenditure since the date of the last previous report filed." *Id.* § 42.17.100(3)(c). Finally, three updates to the initial report are required on certain dates pegged to the election at issue: (1) the twenty-first day before the election, (2) the seventh day before the election, and (3) the tenth day of the month after the election. *Id.*

§ 42.17.100(3). The entity's reporting obligations cease after the post-election report is filed. *Id.*

In addition to disclosures for independent expenditures, the Disclosure Law sets forth requirements for "political advertising," defined as "any advertising displays, newspaper ads, billboards, signs, brochures, articles, tabloids, flyers, letters, radio or television presentations, or other means of mass communication, used for the purpose of appealing, directly or indirectly, for votes or for financial or other support or opposition in any election campaign." *Id.* § 42.17.020(38). An advertisement must identify its sponsor: written political advertising must include the sponsor's name and address; radio and television ads must state the sponsor's name; and advertising undertaken as an independent expenditure must state that the advertisement was not approved by any candidate. *See id.* § 42.17.510(1)-(4). The Disclosure Law requires special reports for political advertising made twenty-one days before an election and that has a fair market value of $1,000 or more. *Id.* § 42.17.103(1). Such special reports must include the name and address of the person making the expenditure; the name and address of the person to whom the expenditure was made; a detailed description of the expenditure; the date that the expenditure was made and that the advertising was presented to the public; the amount of the expenditure; and the name of the candidate or ballot proposition supported or opposed by the expenditure. *Id.* § 42.17.103(3).

These disclosure requirements do not apply to a "news item, feature, commentary, or editorial in a regularly scheduled news medium that is of primary interest to the general public, that is in a news medium controlled by a person whose business is that news medium, and that is not controlled by a candidate or a political committee." *Id.* § 42.17.020(15)(b)(iv) (listing news media exceptions to the definition of "contribution"); Wash. Admin. Code § 390-16-206 (exempting news media from independent expenditure disclosure requirements). Nor do they apply to "letters to the editor, news or

feature articles, editorial comment or replies thereto in a regularly published newspaper, periodical, or on a radio or television broadcast where payment for the printed space or broadcast time is not normally required." Wash. Admin. Code § 390-05-290 (listing exceptions to the definition of "political advertising"); *id.* § 390-16-206 (exempting the foregoing from political advertising disclosure requirements).

## C.   Procedural History

On April 16, 2008, Human Life filed this lawsuit, seeking a declaration that Washington's Disclosure Law is unconstitutional and an injunction against its enforcement. On August 7, 2008, Human Life moved for summary judgment. It submitted no evidence in support of its motion, instead stating that all relevant facts were set forth in its verified complaint. In opposition, the Commission submitted declarations and other documents containing information about the Commission's operations and the public's use of the disclosure data it had compiled. In reply, Human Life submitted excerpts of its CEO Dan Kennedy's deposition.

While Human Life's summary judgment motion remained pending, Washington voters approved Initiative 1000 on Election Day, November 4, 2008, effectively legalizing physician-assisted suicide. Thereafter, on January 8, 2009, the district court denied Human Life's summary judgment motion. After ruling that Initiative 1000's passage did not moot Human Life's lawsuit, the district court rejected Human Life's contention that the Disclosure Law's requirements for "political committees," "independent expenditures," and "political advertising" are unconstitutional. Final judgment was entered on January 23, 2009. We have jurisdiction over the district court's final judgment pursuant to 28 U.S.C. § 1291, and "[w]e review the constitutionality of a statute de novo." *United States v. Vongxay*, 594 F.3d 1111, 1114 (9th Cir. 2010).

## II.  DISCUSSION

### A.  Justiciability

"[T]he Constitution mandates that prior to our exercise of jurisdiction there exist a constitutional 'case or controversy,' that the issues presented are 'definite and concrete, not hypothetical or abstract.' " *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc) (quoting *Ry. Mail Ass'n v. Corsi*, 326 U.S. 88, 93 (1945)). Thus, before reaching the merits of Human Life's constitutional claims, we must determine whether this appeal is justiciable. *See Long Beach Area Chamber of Commerce v. City of Long Beach,* 603 F.3d 684, 689 (9th Cir. 2010). We agree with the district court's reasoning and conclude that the appeal presents a case or controversy even though Human Life refrained from engaging in its planned public education campaign, and we find that the controversy remains live even after the passage of Initiative 1000 almost two years ago.

### 1.  Standing and Ripeness

To satisfy Article III's case or controversy requirement, Human Life must establish standing to sue. "[T]he irreducible constitutional minimum of standing contains three elements": the plaintiff must demonstrate (1) an injury-in-fact, (2) causation, and (3) a likelihood that the injury will be redressed by a decision in the plaintiff's favor. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Because the court's role is "neither to issue advisory opinions nor to declare rights in hypothetical cases," the case or controversy standard also requires that a claim be ripe for review. *Thomas*, 220 F.3d at 1138 ("The constitutional component of the ripeness inquiry is often treated under the rubric of standing . . . ."). In the context of pre-enforcement constitutional challenges, where the plaintiff has not yet been penalized for violating the challenged statute, we have held that "neither the mere existence of a proscriptive statute nor a generalized threat of prosecu-

tion satisfies the 'case or controversy' requirement." *Id.* at 1139. Rather, in general, a case or controversy exists only if the plaintiff faces a "genuine threat of imminent prosecution." *Id.*

**[1]** However, when a challenged statute risks chilling the exercise of First Amendment rights, "the Supreme Court has dispensed with rigid standing requirements," *Cal. Pro-Life Council, Inc. v. Getman (CPLC-I)*, 328 F.3d 1088, 1094 (9th Cir. 2003), and recognized "self-censorship" as "a harm that can be realized even without an actual prosecution," *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988); *see also Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965) ("Because of the sensitive nature of constitutionally protected expression, we have not required that all of those subject to overbroad regulations risk prosecution to test their rights."). As we have held, where a plaintiff has refrained from engaging in expressive activity for fear of prosecution under the challenged statute, such self-censorship is a "constitutionally sufficient injury" as long as it is based on "an actual and wellfounded fear" that the challenged statute will be enforced. *CPLC-I*, 328 F.3d at 1093, 1095; *see also Ariz. Right to Life PAC v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003) (finding that an entity that was "forced to modify its speech and behavior to comply with the statute" had suffered injury even though it had "neither violated the statute nor been subject to penalties for doing so"). Such fear exists if the "intended speech arguably falls within the statute's reach." *CPLC-I*, 328 F.3d at 1095.

The present appeal is indistinguishable from *CPLC-I*, where we found that the California Pro-Life Council ("CPLC") had established standing even though it had not been subject to prosecution under the statute it challenged. The statute required disclosures for any communication that "unambiguously urges a particular result in an election." *Id.* at 1096 (emphasis omitted). Because CPLC "feared enforcement proceedings might be initiated," *id.* at 1094, CPLC

refrained from spending money to distribute voter guides that advocated pro-life positions implicated by pending ballot initiatives, *id.* at 1092-93. Even though CPLC's voter guides did not use "explicit words of advocacy," we concluded that they arguably fell within the statute's provisions. *Id.* at 1095. Thus, although we cautioned that "[t]he self-censorship door to standing does not open for every plaintiff," we concluded that CPLC's self-censorship was based on a reasonable fear of prosecution and was therefore a "constitutionally recognized injury." *Id.*

**[2]** Because Human Life's decision to refrain from implementing its educational program was based on a reasonable fear of enforcement of the Disclosure Law, we conclude that Human Life has established a case or controversy. Human Life produced evidence of planned communications that arguably fall within the ambit of the statute it is challenging. The Disclosure Law imposes obligations on an entity when one of its "primary purposes" is "to affect, directly or indirectly, governmental decision making by supporting or opposing candidates or ballot propositions." *Evergreen*, 49 P.3d at 903 (quoting *Evans*, 546 P.2d at 79) (interpreting the definition of "political committee"). Disclosure obligations also apply to political advertising "used for the purpose of appealing, directly or indirectly, for votes," Wash. Rev. Code § 42.17.020(38), and to expenditures "made in support of or in opposition to any candidate or ballot proposition" that meet certain monetary thresholds, *id.* § 42.17.100. Given the Disclosure Law's apparent coverage, Human Life's fear of being subject to its enforcement is well founded, and Human Life "does not have to await the consummation of threatened injury to obtain preventive relief." *Ariz. Right to Life PAC*, 320 F.3d at 1006 (quoting *Reg'l Rail Reorg. Act Cases*, 419 U.S. 102, 143 (1974)).

## 2. Mootness

**[3]** The passage of Initiative 1000 in 2008 does not alter the justiciability of Human Life's constitutional challenge

because that challenge falls squarely within the class of cases "capable of repetition, yet evading review." *See, e.g.*, *Davis v. FEC*, 128 S. Ct. 2759, 2770 (2008); *FEC v. Wis. Right to Life, Inc. (WRTL)*, 551 U.S. 449, 462 (2007); *Bellotti*, 435 U.S. at 774. This "established exception" to the mootness doctrine applies where "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration; and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Davis*, 128 S. Ct. at 2769 (quoting *WRTL*, 551 U.S. at 462). As we have recognized, the exception frequently arises in election cases "because the inherently brief duration of an election is almost invariably too short to enable full litigation on the merits." *Porter v. Jones*, 319 F.3d 483, 490 (9th Cir. 2003); *see also, e.g.*, *WRTL*, 551 U.S. at 462 (reviewing a challenge to federal limits on corporate electioneering expenditures after the relevant primary election); *Norman v. Reed*, 502 U.S. 279, 287-88 (1992) (reviewing a challenge to state requirements governing the use of a name by a new political party after the relevant county election); *Bellotti*, 435 U.S. at 774 (reviewing a challenge to a state ban on corporate expenditures to influence votes on referendum proposals after the relevant referendum vote); *Alaska Right to Life Comm. v. Miles (ARTLC)*, 441 F.3d 773, 779 (9th Cir. 2006) (reviewing a challenge to state disclosure provisions after the relevant ballot initiative vote); *CPLC-I*, 328 F.3d at 1095 n.4 (same); *Reich v. Local 396, Int'l Bhd. of Teamsters*, 97 F.3d 1269, 1272 n.5 (9th Cir. 1996) (reviewing a challenge to withholding information from a candidate after the candidate's opportunity to be elected had passed).

The present appeal is a case in point. Although Human Life filed suit almost seven months before the November 2008 vote on Initiative 1000, complete litigation of Human Life's claim requires a considerably longer period of time. Indeed, this litigation continues nearly two years after the Initiative 1000 vote has come and gone. As with most election cases, we have little difficulty concluding that the duration element

of the "capable of repetition, yet evading review" exception applies to the circumstances here.

As for the reasonable expectation requirement, we conclude there is a reasonable expectation that Human Life again will be subject to self-censorship if the Disclosure Law's constitutionality remains in doubt. Human Life is a politically active organization that has been heavily involved in public debates about pro-life issues in the past and intends to undertake future communications like those it wished to make in conjunction with the Initiative 1000 vote. This is sufficient to establish a reasonable expectation that Human Life will face the prospect of enforcement of the Disclosure Law again. *See, e.g.*, *WRTL*, 551 U.S. at 463 (rejecting a mootness argument in a suit by an ideological advocacy corporation, stating that it "credibly claimed that it planned on running 'materially similar' future targeted broadcast ads mentioning a candidate within the blackout period and there is no reason to believe that the FEC will 'refrain from prosecuting violations' of BCRA" (citations omitted)); *ARTLC*, 441 F.3d at 779 (rejecting a mootness argument where nonprofit AKRTL planned to engage in a routine, ideological telemarketing campaign when "the provisions of Alaska law challenged by AKRTL remain in place"); *CPLC-I*, 328 F.3d at 1095 n.4 (rejecting a mootness argument where an issue advocacy corporation planned to distribute voter guides as it had in the past in the face of state disclosure requirements).

## B.    Facial Challenges to the Disclosure Law

At the heart of Human Life's appeal is its contention that certain aspects of the Disclosure Law are facially unconstitutional. In particular, Human Life argues that the Disclosure Law's definitions of "political committee," "independent expenditure," and "political advertising" impose burdens that cannot be justified by Washington State's interest in disclosure and are therefore unconstitutional. We begin by identifying the applicable level of judicial scrutiny. We then discuss

the governmental interest supporting the Disclosure Law's requirements. Finally, we turn to Human Life's arguments that certain Disclosure Law provisions are not sufficiently tailored to that interest.

## 1.  Standard of Review

**[4]** The parties dispute the level of judicial scrutiny applicable to Washington State's disclosure requirements, and indeed, there has been room for debate on this issue given this circuit's wrestling with the standard of review appropriate in disclosure cases. The Supreme Court's seminal campaign finance decision, *Buckley v. Valeo*, mapped the basic distinction between financial limitations, which "necessarily reduce[ ] the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached," and disclosure requirements, which "impose no ceiling on campaign-related activities." *Buckley v. Valeo*, 424 U.S. 1, 19, 64 (1976) (per curiam). It noted that, in contrast to expenditure and contribution limitations, "disclosure requirements — certainly in most applications — appear to be the least restrictive means of curbing the evils of campaign ignorance and corruption that Congress found to exist." *Id.* at 68. However, the Court also recognized that "significant encroachments on First Amendment rights of the sort that compelled disclosure imposes cannot be justified by a mere showing of some legitimate governmental interest." *Id.* at 64. Rather, the *Buckley* Court applied "exacting scrutiny" to the disclosure requirements and "insisted that there be a 'relevant correlation' or 'substantial relation' between the governmental interest and the information required to be disclosed." *Id.* at 68 (footnotes omitted).

**[5]** Despite the *Buckley* Court's clear endorsement of "exacting scrutiny," confusion emerged in our circuit as to the level of judicial scrutiny applicable to constitutional challenges to campaign finance disclosure requirements. Much of the confusion can be traced to our initial interpretation of the

Supreme Court's decision in *FEC v. Massachusetts Citizens for Life, Inc. (MCFL)*, 479 U.S. 238 (1986). In *MCFL*, the Court considered the constitutionally of a federal prohibition on corporate independent expenditures as applied to MCFL, a nonprofit, non-stock, ideological corporation not unlike Human Life. *Id.* at 241-42. Although MCFL did not qualify as a "political committee" under the federal statute, then-existing law prohibited any corporation from making independent expenditures unless the corporation established a separate, segregated fund containing monies specifically earmarked for campaign spending. *Id.* at 253. This separate fund would be subject to "political committee" requirements, including "[d]etailed record keeping and disclosure obligations, along with the duty to appoint a treasurer and custodian of the records," thus essentially requiring MCFL "to assume a more sophisticated organizational form." *Id.* at 254; *see also ARTLC*, 441 F.3d at 791 (distinguishing the provisions at issue in *MCFL* because they "require structural changes"). The Court found that the "practical effect" of imposing such requirements on organizations like MCFL was to make "engaging in protected speech a severely demanding task," *MCFL*, 479 U.S. at 256, thereby "directly limiting the ability of such organizations to engage in core political speech," *id.* at 254. Considering the as-applied challenge, the *MCFL* Court subjected the federal provision to strict scrutiny review and concluded that it was unconstitutional as applied to MCFL. *Id.* at 256.

That *MCFL* involved a financial limitation rather than a disclosure requirement is an arguable basis for distinguishing the rationale for applying the strict scrutiny standard in *MCFL* from the application of the exacting scrutiny standard in the disclosure context in *Buckley*. However, because the *MCFL* Court discussed its application of strict scrutiny in terms of the onerous disclosure requirements imposed upon segregated funds (rather than in terms of the financial limitations imposed on corporations), we read the two cases as being in tension with one another.

Our analysis in *CPLC-I* reflects this interpretation of *Buckley* and *MCFL* as inconsistent. In *CPLC-I*, an ideological advocacy corporation challenged California's requirement that "political committees" disclose information about financial activities undertaken to "expressly advocate the passage or defeat of a ballot measure." *CPLC-I*, 328 F.3d at 1092. In light of the differing standards of review applied in *Buckley* and *MCFL*, we stated that "the Supreme Court has been less than clear as to the proper level of judicial scrutiny we must apply in deciding the constitutionality of disclosure regulations." *Id.* at 1101 n.16. We reasoned, "Given that the *MCFL* Court considered FECA's disclosure requirements to be a severe burden on political speech for multi-purpose organizations, we must analyze the California statute under strict scrutiny." *Id.* "Notwithstanding *Buckley*," we therefore held that the strict scrutiny standard applies to disclosure requirements, and we remanded to the district court to apply that test. *Id.*

Following our decision in *CPLC-I*, the waters of the applicable standard of review were further muddied by the Supreme Court's decision in *McConnell v. FEC*, 540 U.S. 93 (2003). Considering a federal campaign finance disclosure law, *McConnell* upheld the requirement that any person making disbursements of $10,000 or more in a calendar year for electioneering communications must file a statement with the FEC identifying the pertinent election and all persons sharing the costs of the disbursements. *Id.* at 194. The *McConnell* Court did not explicitly describe the level of scrutiny applied to the disclosure requirements, stating only that the requirements were supported by "important state interests." *Id.* at 196. In its analysis, the *McConnell* Court appeared to endorse *Buckley*'s use of exacting scrutiny, stating that *Buckley* "amply supports application of [the] disclosure requirements" at issue. *Id.* However, it did not distinguish *MCFL* or its application of the strict scrutiny standard. *Id.*

After *McConnell* augmented the confusion regarding the applicable standard of review in disclosure cases, our circuit

began to avoid the issue rather than stating the appropriate level of scrutiny in any given context. For example, in *ARTLC*, rather than attempting to untangle the conflicting doctrine, we first acknowledged that the applicable standard of review was "somewhat unclear," *ARTLC*, 441 F.3d at 787, and then we resolved to "assume without deciding that strict scrutiny applies to all of the challenged disclosure requirements," *id.* at 788. The following year in *California Pro-Life Council, Inc. v. Randolph (CPLC-II)*, 507 F.3d 1172 (9th Cir. 2007), we again avoided deciding the standard of review issue, concluding that the law of the case, as established in *CPLC-I*, required application of the strict scrutiny standard. *Id.* at 1177 n.5 ("We need not resolve any potential conflict because we are bound by the 'law of the case' to apply strict scrutiny."). Finally, in *Canyon Ferry Road Baptist Church v. Unsworth*, 556 F.3d 1021 (9th Cir. 2009), after lamenting that the degree of scrutiny applicable to disclosure requirements "is somewhat unclear, due in part to arguably inconsistent precedent," we stated, "We do not need to decide this complex question to adjudicate this case." *Id.* at 1031.

**[6]** Recent Supreme Court decisions have eliminated the apparent confusion as to the standard of review applicable in disclosure cases. The Court has clarified that a campaign finance disclosure requirement is constitutional if it survives exacting scrutiny, meaning that it is substantially related to a sufficiently important governmental interest. In *Doe v. Reed*, 130 S. Ct. 2811 (2010), the Supreme Court examined a statute authorizing public disclosure of the signatories to a ballot initiative. In explaining why disclosure requirements were subject to the less demanding standard of review of exacting scrutiny, the *Reed* Court emphasized that the statute at issue was "not a prohibition on speech, but instead a *disclosure* requirement." *Id.* at 2818. As the Court held in *Citizens United*, "disclosure requirements may burden the ability to speak, but they 'impose no ceiling on campaign-related activities' and 'do not prevent anyone from speaking.' " *Citizens*

*United*, 130 S. Ct. at 914 (quoting *Buckley*, 424 U.S. at 64; *McConnell*, 540 U.S. at 201). The *Reed* Court continued:

> We have a series of precedents considering First Amendment challenges to disclosure requirements in the electoral context. These precedents have reviewed such challenges under what has been termed "exacting scrutiny." That standard requires a substantial relation between the disclosure requirement and a sufficiently important governmental interest.

*Reed*, 130 S. Ct. at 2818 (citations and internal quotation marks omitted). As the latest in a trilogy of recent Supreme Court cases, *Reed* confirmed that exacting scrutiny applies in the campaign finance disclosure context. *See Citizens United*, 130 S. Ct. at 914; *Davis*, 128 S. Ct. at 2765-66. We therefore apply exacting scrutiny to Human Life's facial challenges to the Disclosure Law and examine whether the law's requirements are substantially related to a sufficiently important governmental interest.

## 2.   Governmental Interest

[7] Providing information to the electorate is vital to the efficient functioning of the marketplace of ideas, and thus to advancing the democratic objectives underlying the First Amendment. As the Supreme Court explained in *Buckley*, "In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential." *Buckley*, 424 U.S. at 14-15; *see also McConnell*, 540 U.S. at 197 (recognizing the "First Amendment interests of individual citizens seeking to make informed choices in the political marketplace" (quoting *McConnell v. FEC*, 251 F. Supp. 2d 176, 237 (D.D.C. 2003))). Thus, by revealing information about the contributors to and participants in public discourse and debate, disclosure laws help

ensure that voters have the facts they need to evaluate the various messages competing for their attention.

**[8]** This vital provision of information repeatedly has been recognized as a sufficiently important, if not compelling, governmental interest. As the Court first articulated in *Buckley*,

> [D]isclosure provides the electorate with information "as to where political campaign money comes from and how it is spent by the candidate" in order to aid the voters in evaluating those who seek federal office. It allows voters to place each candidate in the political spectrum more precisely than is often possible solely on the basis of party labels and campaign speeches. The sources of a candidate's financial support also alert the voter to the interests to which a candidate is most likely to be responsive and thus facilitate predictions of future performance in office.

*Buckley*, 424 U.S. at 66-67. *Buckley* recognized this informational interest as substantial, and in its campaign finance jurisprudence, the Supreme Court consistently has acknowledged the important role played by disclosure requirements in political discourse. *See Citizens United*, 130 S. Ct. at 915-16 (recognizing the government's informational interest as substantial and stating that the "First Amendment protects political speech; and disclosure permits citizens and shareholders to react to the speech of corporate entities in a proper way"); *McConnell*, 540 U.S. at 197 (upholding BCRA's disclosure requirements, while striking down its segregated fund requirement); *MCFL*, 479 U.S. at 262 (relying on the existence of disclosure requirements in rejecting the government's argument that failure to apply the more onerous segregated fund requirement to MCFL would result in dangerous amounts of spending by nonprofits on behalf of corporations and unions). Similarly, we have frequently reiterated what we recognized in *CPLC-I*: that in the "cacophony of political communications through which California voters must pick

out meaningful and accurate messages . . . being able to evaluate who is doing the talking is of great importance." *CPLC-I*, 328 F.3d at 1105; *see also Canyon Ferry*, 556 F.3d at 1032 ("[W]e have little trouble concluding that Montana's informational interest is generally 'important' in the context of Montana's statewide ballot issues."); *CPLC-II*, 507 F.3d at 1179 n.8 ("[I]n the context of disclosure requirements, the government's interest in providing the electorate with information related to election and ballot issues is well-established."); *ARTLC*, 441 F.3d at 793 (recognizing that "[i]ndividual citizens seeking to make informed choices in the political marketplace . . . need to know what entity is funding a communication" (citation and internal quotation marks omitted)).

**[9]** We have observed that these considerations "apply just as forcefully, if not more so, for voter-decided ballot measures." *CPLC-I*, 328 F.3d at 1105. In the ballot initiative context, where voters are responsible for taking positions on some of the day's most contentious and technical issues, "[v]oters act as legislators," while "interest groups and individuals advocating a measure's defeat or passage act as lobbyists." *Id.* at 1106. As a result of this process, "average citizens are subjected to advertising blitzes of distortion and half-truths and are left to figure out for themselves which interest groups pose the greatest threats to their self-interest." *Id.* at 1105-06 (quoting David S. Broder, Democracy Derailed: Initiative Campaigns and the Power of Money 18 (2000)). Thus, the high stakes of the ballot context only amplify the crucial need to inform the electorate that is well recognized in the context of candidate elections.

Notably, in the lobbying context, the Supreme Court has upheld disclosure requirements enabling lawmakers "to know who is being hired, who is putting up the money, and how much." *United States v. Harriss*, 347 U.S. 612, 625 (1956). The Court found these requirements necessary because "legislative complexities are such that individual members of Con-

gress cannot be expected to explore the myriad pressures to which they are regularly subjected. Yet full realization of the American ideal of government by elected representatives depends to no small extent on their ability to properly evaluate such pressures." *Id.*

In a similar manner, citizens, acting "as lawmakers, have an interest in knowing who is lobbying for their vote, just as members of Congress may require lobbyists to disclose who is paying for the lobbyists' services and how much." *CPLC-I*, 328 F.3d at 1106; *see also Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 298 (1981) (recognizing in the ballot initiative context the interest of voters in knowing "the identity of those whose money supports or opposes a given ballot measure"). Indeed, the provision of this information is particularly critical in the ballot measure context, "especially when one considers that ballot-measure language is typically confusing, and the long-term policy ramifications of the ballot measure are often unknown." *CPLC-I*, 328 F.3d at 1106. If nothing else, "knowing who backs or opposes a given initiative" will give voters "a pretty good idea of who stands to benefit from the legislation." *Id.*

Access to reliable information becomes even more important as more speakers, more speech — and thus more spending — enter the marketplace, which is precisely what has occurred in recent years. Like campaigns for elected office, ballot initiatives are the subject of intense debate and, accordingly, greater expenditures to ensure that messages reach voters. As we noted in *CPLC-I*, "initiative campaigns have become a money game." *Id.* at 1105 (quoting Broder at 18). By one account, spending on political campaigns reached $5.3 billion in 2008, a 27% increase over 2004 spending. *See* Jeanne Cummings, *2008 Campaign Costliest in U.S. History*, Politico, Nov. 5, 2008. The Commission's own data reveal that independent expenditures in Washington elections and ballot initiative contests increased from $269,275 in 1994 to nearly $8 million in 2004. According to the Commission,

committees reported receiving more than $12.5 million in contributions and making more than $12 million in expenditures for ballot initiatives in 2006, and expenditures for and against a single ballot measure have reached more than $15.5 million. As one journalist has observed, "Money does not always prevail in initiative fights, but it is almost always a major — even dominant — factor." Broder at 7; *see also* Daniel Smith, Campaign Financing of Ballot Initiatives in the American States 71 (2001) ("[C]ampaign financing . . . play[s] a central role in ballot measures.").

The district court noted the particular importance of the government's informational interest in this case given the nature of ballot initiative campaigns across the country: "The state's interest in informing the electorate about 'where political campaign money comes from and how it is spent' is only amplified in the ballot initiative context as more and more money is poured into ballot measures nationwide." *Human Life of Wash., Inc. v. Brumsickle*, No. C08-0590-JCC, 2009 WL 62144, at *13 (W.D. Wash. Jan. 8, 2009) (citation omitted). The district court concluded that the "state therefore retains an extremely compelling interest in 'following the money' in the ballot initiative context so that the electorate's decision may be an informed one." *Id.* As trends in campaign finance jurisprudence have opened the door to even more political expenditures in the future, the magnitude of the state's interest is only likely to increase.[2] *See, e.g.*, *Citizens United*, 130 S. Ct. at 911 (holding unconstitutional a prohibition on corporate independent expenditures and stating that "it is our law and our tradition that more speech, not less, is the governing rule" under the First Amendment); *Long Beach*

---

[2]Alarmingly, as levels in political spending rise dramatically, the percentage of independent entities disclosing information about where that political spending comes from has sharply declined. *See* Editorial, *The Secret Election*, N.Y. Times, Sept. 18, 2010 (reporting that the rate of disclosure by independent groups receiving electioneering donations dropped from almost 100% in 2004 and 2006, to less than 50% in 2008, to only 32% in 2010).

*Area Chamber of Commerce*, 603 F.3d at 695-99 (following *Citizens United* to deem limitations on contributions to and expenditures by independent expenditure committees violative of the First Amendment).

Campaign finance disclosure requirements thus advance the important and well-recognized governmental interest of providing the voting public with the information with which to assess the various messages vying for their attention in the marketplace of ideas. An appeal to cast one's vote a particular way might prove persuasive when made or financed by one source, but the same argument might fall on deaf ears when made or financed by another. The increased "transparency" engendered by disclosure laws "enables the electorate to make informed decisions and give proper weight to different speakers and messages." *Citizens United*, 130 S. Ct. at 916. As the Supreme Court has stated: "[T]he people in our democracy are entrusted with the responsibility for judging and evaluating the relative merits of conflicting arguments. They may consider, in making their judgment, the source and credibility of the advocate." *Bellotti*, 435 U.S. at 791-92. Disclosure requirements, like those in Washington's Disclosure Law, allow the people in our democracy to do just that.

### 3.   Tailoring Analysis

**[10]** To survive exacting scrutiny, the Disclosure Law's challenged provisions must bear a substantial relationship to Washington State's sufficiently important interest in providing the electorate with source and financial information to inform their decisionmaking at the ballot box. *See Reed*, 130 S. Ct. at 2818. Human Life contends that three aspects of the Disclosure Law are insufficiently related to Washington's interest in ensuring an informed electorate: (a) the definition of "political committee"; (b) the disclosure requirements imposed on political committees; and (c) the definitions of "independent expenditure" and "political advertising."

### a.   Definition of "Political Committee"

**[11]**  An organization qualifies as a "political committee" if its "primary or one of the primary purposes" is "to affect, directly or indirectly, governmental decision making by supporting or opposing candidates or ballot propositions." *Evergreen Freedom Found.*, 49 P.3d at 903 (quoting *Evans*, 546 P.2d at 79). Human Life contends that this definition sweeps too broadly, and thus is not substantially related to the government's informational interest, because it covers groups with "a" primary purpose of political advocacy, instead of being limited to groups with "the" primary purpose of political advocacy. Human Life argues that the First Amendment categorically prohibits the government from designating a group as a "political committee" unless the group's sole, primary purpose is political advocacy, and it argues that this result is compelled by the Supreme Court's decision in *Buckley*. Thus, Human Life contends that the breadth of the Disclosure Law's definition of "political committee" renders it per se facially unconstitutional. We disagree with Human Life's premise regarding the scope of constitutionally permissible political committee regulation and with its conclusion that the Disclosure Law's definition of "political committee" is too broad to be substantially related to the government's important informational interest.

To support its proposed bright-line prohibition on regulating groups with only "a" primary purpose of political advocacy, Human Life relies on *Buckley*. There, the Supreme Court narrowly construed the definition of "political committee" under federal campaign finance law.[3] The Court noted that FECA's definition of "political committee" referred only to a monetary threshold, and thus could be construed as reaching large amounts of pure issue advocacy — in which case the

---

[3]Federal Election Campaign Act of 1971 (FECA), 86 Stat. 3 (1972), *amended by* Bipartisan Campaign Reform Act of 2002 (BCRA), 116 Stat. 81, 2 U.S.C. § 431 et seq.

burdens imposed on speech would outstrip the governmental interests furthered by the Act. To avoid this unconstitutional result, the *Buckley* Court adopted the lower court's narrowing construction of the definition of "political committees":

> To fulfill the purposes of the Act they need only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate. Expenditures of candidates and of "political committees" so construed can be assumed to fall within the core area sought to be addressed by Congress. They are, by definition, campaign related.

*Buckley*, 424 U.S. at 79. Thus, by limiting the definition of which entities were subject to FECA's requirements, the Court ensured that those requirements were substantially related to the purposes of the Act.

Seizing upon the phrase "the major purpose," Human Life insists that a statute is unconstitutional under *Buckley* if it imposes disclosure requirements on groups with multiple "major purposes," even if one of the group's major purposes happens to be political advocacy. Put differently, Human Life argues that *Buckley* establishes a bright-line rule that, unless the sole major purpose of a group is political advocacy, any regulation of that group will automatically be too burdensome to be justified by the state's informational interest. The Fourth Circuit has adopted Humans Life's view, reading *Buckley* as a statement of "the Supreme Court's insistence that political committees can only be regulated if they have the support or opposition of candidates as their primary purpose." *N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 289 (4th Cir. 2008).

**[12]** We disagree with Human Life's reading of *Buckley*, and we reject its invitation to adopt a bright-line rule prohibiting all regulation of groups with "a" primary purpose of political advocacy. The *Buckley* Court's statement that a narrow

definition of political committee "can be assumed to fall within the core area sought to be addressed by Congress" is most reasonably read to mean exactly what it says — that it was clear and uncontroversial that the burdens imposed by the disclosure requirements in that case were "by definition" substantially related to the government's interests when applied to organizations whose single major purpose was political advocacy. Nothing in *Buckley* suggests, however, that disclosure requirements are constitutional only when so applied. Contrary to Human Life's interpretation, *Buckley*'s statement — that defining groups with "the major purpose" of political advocacy as political committees is sufficient "[t]o fulfill the purposes of the Act," *Buckley* 424 U.S. at 79 — does not indicate that an entity must have that major purpose to be deemed constitutionally a political committee. *See, e.g.*, *CPLC-II*, 507 F.3d at 1180 n.11 ("[T]his Court has held that irrespective of the major purpose of an organization, disclosure requirements may be imposed."); *Canyon Ferry*, 556 F.3d at 1026 (discussing Montana regulations of "incidental political committees," which are subject to disclosure requirements if they make contributions or expenditures, regardless of their primary purpose). Rather, in stating that disclosure requirements "(1) cannot cover 'groups engaged purely in issue discussion' and (2) can cover 'groups the major purpose of which is the nomination or election of a candidate,' " the *Buckley* Court "defined the outer limits of permissible political committee regulation." *Leake*, 525 F.3d at 327 (Michael, J., dissenting). What is permissible within these outer limits depends on whether the burdens imposed by the disclosure requirements are substantially related to the government's important informational interest.

Human Life argues that our reading of *Buckley* is inconsistent with the Supreme Court's decision in *MCFL*, which it claims "reaffirmed *Buckley*'s major-purpose test." *MCFL* did no such thing. *MCFL* considered whether the burden of a corporate campaign expenditure limitation was unconstitutional as applied to an ideological nonprofit; it did not consider a facial challenge to a disclosure requirement imposed on enti-

ties engaging in political advocacy. *See MCFL*, 479 U.S. at 241. Not only did *MCFL* involve a higher standard of review than is appropriate here, but it also dealt with significantly more severe burdens on First Amendment rights. As the Supreme Court has made clear, financial limitations are subject to a different constitutional analysis than are disclosure requirements. *See, e.g.*, *Reed*, 130 S. Ct. at 2813; *Citizens United*, 130 S. Ct. at 914. Limitations on expenditures entail the application of strict scrutiny rather than exacting scrutiny, and they are uniformly recognized as implicating the most central First Amendment interests. As the Court in *MCFL* stated, independent expenditures lie at "the core of our electoral process and of First Amendment freedoms," *MCFL*, 479 U.S. at 251 (quoting *Buckely*, 424 U.S. at 39)), and their limitation must be justified by a compelling state interest. The Court also recognized the significant burden imposed by such limitations, which have the effect of "directly limiting" some entities' ability to "engage in core political speech," *id.* at 255, whereas disclosure requirements are "less restrictive," *id.* at 262. Furthermore, in *MCFL*, political advocacy was not "a" major purpose — much less "the" major purpose — of MCFL, which the Court noted only "occasionally engages in activities on behalf of political candidates," and whose "central organizational purpose is issue advocacy." *Id.* at 253 n.6.

Thus, the proposed bright-line prohibition that Human Life argues is established by *Buckley* was not at issue in *MCFL* and is not supported by its reasoning. The Court stated that, "should MCFL's independent spending become so extensive that the organization's major purpose may be regarded as campaign activity," it would be classified as a political committee under the existing statute. *MCFL*, 479 U.S. at 262. But this statement that MCFL's increased campaign spending could render it a political committee under the statute in no way forecloses the government's ability to affirmatively designate as "political committees" groups with "a" major purpose of political advocacy.

Having rejected the notion that the First Amendment categorically prohibits the government from imposing disclosure requirements on groups with more than one "major purpose," we turn to the crux of the applicable constitutional analysis — whether there is a substantial relationship between Washington State's informational interest and its decision to impose disclosure requirements on organizations with a primary purpose of political advocacy. We conclude that there is.

**[13]** The Disclosure Law does not extend to all groups with "a purpose" of political advocacy, but instead is tailored to reach only those groups with a "primary" purpose of political activity. This limitation ensures that the electorate has information about groups that make political advocacy a priority, without sweeping into its purview groups that only incidentally engage in such advocacy. Under this statutory scheme, the word "primary" — not the words "a" or "the" — is what is constitutionally significant. *See Leake*, 525 F.3d at 328 (Michael, J., dissenting) ("The key word providing guidance to both speakers and regulators in 'the major purpose' test or 'a major purpose' test is the word 'major,' not the article before it."). While we do not hold that the word "primary" or its equivalent is constitutionally necessary, we do hold that it is sufficient in this case to ensure that the Disclosure Law is appropriately tailored to the government's informational interest.

**[14]** Furthermore, the Disclosure Law's definition of "political committee" is "tailored to address a fundamental organizational reality" that most organizations "do not have just one major purpose." *Id.* at 330. Human Life concedes, as it must, that there is a substantial relationship between the government's informational interest and the disclosure requirements it may impose on groups whose single primary purpose is political advocacy. We fail to see how that relationship changes so materially as to render the relationship insubstantial once the groups engage in several primary purposes including political advocacy. Indeed, in some circumstances,

the latter relationship may be stronger than the former. Consider, for instance, two otherwise identical groups: One spends 40% of its time and resources on political advocacy, 30% of its time and resources producing merchandise, and 30% of its time and resources overseeing academic research. The other group spends 45% of its time and resources on political advocacy, 45% of its time and resources producing merchandise, and 10% of its time and resources overseeing academic research. Political advocacy is "the" major purpose for the former group (because political advocacy commands the largest share of the group's time and resources), but it is just "a" major purpose of the latter (because the group expends equal time and resources on political advocacy and merchandise production). Under Human Life's interpretation of *Buckley*, the government may constitutionally regulate the former group and not the latter, even though in absolute terms the latter group spends more time and resources than the former on political advocacy. The manner in which the Disclosure Law's definition of "political committee" interacts with the nuances of entities' organizational structure reinforces the conclusion that the definition is substantially related to the government's informational interest.

In addition, the Disclosure Law addresses the "hard lesson of circumvention" that has historically plagued the campaign finance context. *McConnell*, 540 U.S. at 165; *see also Citizens United*, 130 S. Ct. at 912 ("Political speech is so ingrained in our culture that speakers find ways to circumvent [these] campaign finance laws."); *McConnell*, 540 U.S. at 176 ("Experience under the current law demonstrates that Congress' concerns about circumvention are not merely hypothetical."). If the Disclosure Law exempted groups with only "a" primary purpose of political advocacy, a group like Human Life's affiliated political action committee, HLPAC (which unmistakably qualifies as a political committee under the Disclosure Law), could evade political committee status simply by merging with its affiliated organization, and thus diluting the newly created organization's relative share of advocacy

activity. *See Leake*, 525 F.3d at 332 (Michael, J., dissenting) (warning that such a standard "effectively encourages advocacy groups to circumvent the law by *not* creating political action committees and instead to hide their electoral advocacy from view by pulling it into the fold of their larger organizational structure"). Washington's Disclosure Law minimizes this risk of circumvention by tailoring its definition of "political committee" to cover groups with a primary purpose of political advocacy, while still exempting those that are primarily devoted to issue advocacy.

**[15]** Thus, the Disclosure Law's definition of "political committee" is substantially related to the government's sufficiently important informational interest. By applying the disclosure requirements attached to political committee status to organizations with a primary purpose of political advocacy, its coverage vindicates the government's interest in an informed electorate without imposing on nonpolitical organizations unnecessarily. We therefore conclude that the definition of "political committee" does not violate the First Amendment.

#### b.    Political Committee Disclosure Requirements

Human Life argues that, even if the definition of "political committee" is constitutionally permissible and groups with a primary purpose of political advocacy may be regulated, the requirements the Disclosure Law imposes on groups satisfying that definition are unconstitutionally onerous. Human Life relies on our decision in *CPLC-II*, in which we held that California's "political action committee-like" disclosure requirements were unconstitutional as applied to a "nonprofit, nonsectarian, educational organization dedicated to educating the public on abortion, infanticide, and euthanasia." *CPLC-II*, 507 F.3d at 1174, 1187. Applying strict scrutiny, the *CPLC-II* panel cited *MCFL*'s holding that a segregated fund financial requirement was not narrowly tailored to the government's

interest in regulating an ideological nonprofit,[4] and it concluded that the disclosure requirements at issue were not narrowly tailored. The panel noted the Court's conclusion in *MCFL* that the state's informational interest could be achieved "in a manner less restrictive than imposing the full panoply of regulations that accompany status as a political committee." *Id.* at 1189 (quoting *MCFL*, 479 U.S. at 262). Arguing that *CPLC-II* controls the outcome of this case, Human Life characterizes the issue before us as "whether Washington may do what this Court said California may not do" — namely, require political committees to appoint a treasurer, open a bank account in the state, and file certain reports.

We reject Human Life's contention that *CPLC-II* governs the issue of whether Washington State's political committee disclosure requirements are unconstitutionally onerous because we apply a different standard of review than that applied in *CPLC-II*. Though we are bound to follow circuit precedent, an exception to this rule exists: "[I]n the face of intervening Supreme Court and en banc opinions, 'a three-judge panel of this court and district courts should consider themselves bound by the intervening higher authority and reject the prior opinion of this court as having been effectively overruled.' " *United States v. Broussard*, 611 F.3d 1069, 1072 (9th Cir. 2010) (quoting *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc)). Since *CPLC-II* was decided, the Supreme Court has made clear that exacting scrutiny, not strict scrutiny, is applicable to campaign finance disclosure requirements. *See Reed*, 130 S. Ct. at 1288; *Citizens United*, 130 S. Ct. at 914. In light of this intervening Supreme Court

---

[4]We note that because Human Life already has a political action committee, HLPAC, the effect of the Disclosure Law on Human Life differs from the effect the federal law had on the nonprofit in *MCFL*. There, the corporation would have been required to engage in major bureaucratic restructuring due to incidental political advocacy. Here, the structural requirements imposed by the Disclosure Law already exist.

authority, it is clear that *CPLC-II* set the bar too high in applying strict scrutiny. The government need not, as we suggested in *CPLC-II*, employ the least restrictive means to satisfy its interest in providing the electorate with information; it need only ensure that its means are substantially related to that interest. Washington State's disclosure scheme passes that test.

Indeed, it is the Supreme Court's decision in *Citizens United*, rather than the panel decision in *CPLC-II*, that provides the best guidance regarding the constitutionality of the Disclosure Law's requirements. The *Citizens United* Court underscored the fundamental distinction between the burdens imposed by financial regulations, *see Citizens United*, 130 S. Ct. at 897, and those imposed by disclaimer and disclosure requirements, *see id.* at 915-16. Recounting the series of Supreme Court cases that had upheld disclosure requirements while simultaneously striking down other regulations on campaign speech, the Court affirmed and reiterated the importance of disclosure requirements — even requirements that apply to issue advocacy — to the government's interest in informing the electorate. *Id.*

**[16]** Like the requirements in *Citizens United*, Washington State's political committee disclosure requirements are not unconstitutionally burdensome relative to the government's informational interest. Rather, they are narrowly tailored such that the required disclosure increases as a political committee more actively engages in campaign spending and as an election nears. First, the registration form required of all political committees is two pages long and elicits basic information about the organization's name, relationship with other organizations, and persons with authority over the organization's finances. Only entities that expect to raise or spend more than $5,000 in a year or receive more than $500 from a single donor are required to submit additional reports. *See* Wash. Admin. Code § 390-16-105 et seq. (limiting the requirements imposed on political committees that meet the enumerated

criteria). These comparatively active political committees submit three additional reports, the timing of which is pegged to the election in which they are engaging. *See* Wash. Rev. Code § 42.17.080. Only if a political committee subject to post-registration reporting raises or spends more than $200 in a given month must it file a further report providing an update of its financial activities. *See id.* § 42.17.080. These disclosure requirements are not unduly onerous, and their timing and particular informational requirements are substantially related to the government's informational interest.

**[17]** Our conclusion here is compelled by our decision in *ARTLC*, in which we held that Alaska's materially identical political committee disclosure requirements survive strict scrutiny. *See ARTLC*, 441 F.3d at 791. If Alaska's disclosure requirements survive strict scrutiny, then, a fortiori, Washington State's disclosure requirements (which promote the same important governmental interest) survive exacting scrutiny. Our *ARTLC* decision was based on three grounds, each of which is equally applicable here. First, we explained that the provisions at issue were not a financial limitation and required "only reporting of contributions to, and of contributions and expenditures by," regulated entities. *Id.* Second, we observed that there was "no allegation in this case that the reporting provisions limit the fundraising ability" of regulated entities. *Id.* (distinguishing *MCFL*). Finally, we noted that, unlike the provisions in *MCFL*, which essentially required major structural changes to an organization, the disclosure provisions applied to ARTLC imposed minimal, if any, organizational burdens. *Id.* We concluded that "[i]n light of the nature of the burdens imposed" by the registration and reporting requirements, the challenged disclosure provisions passed muster under the First Amendment. *Id*. at 792. Here, too, because the Disclosure Law's somewhat modest political committee disclosure requirements are substantially related to the government's interest in informing the electorate, they survive exacting scrutiny.

### c.   "Independent Expenditure" and "Political Advertising" Definitions

**[18]** We next turn to Human Life's contention that the Disclosure Law's definitions for "independent expenditure" and "political advertising" are too expansive to be substantially related to the government's important interest. The Disclosure Law defines "independent expenditure" in terms of money spent "in support of or opposition to" a candidate or ballot initiative, Wash. Rev. Code § 42.17.100, and it defines "political advertising" as mass communications "used for the purpose of appealing, directly or indirectly," for support in any election campaign, *id.* § 42.17.020(38). Human Life argues that these definitions are facially unconstitutional because they encompass issue advocacy instead of extending only to express advocacy or its functional equivalent. Human Life concedes that the government may impose disclosure requirements on a radio advertisement that expressly urges Washingtonians to vote for or against a particular ballot initiative, but it argues that the government may not impose disclosure requirements on advertisements that avoid references to particular ballot initiatives, and instead speak only about the issues involved in pending ballot initiatives. In other words, Human Life argues that there is a constitutionally significant distinction between an advertisement saying, "physician-assisted suicide is bad policy," at a time when a measure like Initiative 1000 is on the ballot and an advertisement saying, "vote against Initiative 1000." Human Life's position is that the latter advertisement, which is express advocacy, may be subject to disclosure requirements, whereas the former advertisement is constitutionally sacrosanct issue advocacy that may not be regulated. On this basis, it argues that the burdens imposed by the Disclosure Law's political committee obligations are categorically unconstitutional.[5]

---

[5]Although the Fourth Circuit adopted this position in *Leake*, 525 F.3d at 281-83, its decision predates *Citizens United* and *Reed* and therefore is unpersuasive in the disclosure context.

Arguing that *Buckley* established a distinction between the ability to regulate express and issue advocacy, Human Life cites *WRTL*. In *WRTL*, the Supreme Court considered the constitutionality of a federal limitation on campaign speech that prohibited "electioneering communications" during certain "blackout dates" leading up to an election as applied to three advertisements that WRTL wished to pursue. *WRTL*, 551 U.S. at 464. Although the ads were clearly prohibited by the federal statute, they did not contain "magic words of express advocacy" as identified in *Buckley*. The Court had already determined in *McConnell* that such magic words were not a prerequisite to regulation and that, as long as the communications were the "functional equivalent" of express advocacy, they fell within the definition of communications constitutionally subject to disclosure. *McConnell*, 540 U.S. at 193-94. Thus, the question before the *WRTL* Court was the scope of the definition of "functional equivalent."

The Court defined "express advocacy or its functional equivalent" as communications "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." *WRTL*, 551 U.S. at 469-70. The Court concluded that WRTL's ads — which did not discuss an issue in an upcoming election, did not urge their audience to vote for or against any candidate or measure, and merely encouraged citizens to contact their senators and urge them to oppose an ongoing filibuster — were neither express advocacy nor "susceptible of no reasonable interpretation other than as an appeal for a vote." *Id.* at 458-60, 470. Because they did not fall within the express advocacy category that was automatically constitutionally permissible, the Court subjected the regulations to strict scrutiny. Concluding that it had "never recognized a compelling interest in regulating ads, like WRTL's, that are neither express advocacy nor its functional equivalent," *id.* at 464-65, the Court held that the ads could not constitutionally be subject to the federal prohibition on electioneering communications, *id.* at 466.

**[19]** As a preliminary matter, we could arguably dispose of Human Life's challenge to the disclosure requirements by concluding that its communications constitute the functional equivalent of express advocacy under *WRTL*. Human Life's proposed communications, even if they do not mention Initiative 1000 by name, are susceptible of no reasonable interpretation other than as an urgent appeal to vote down the measure. The communications explicitly state that physician-assisted suicide has reentered the realm of public debate and that the situation demands action. Even if the communications were less obvious, the *WRTL* Court noted that certain background information may be relevant in determining whether a communication can reasonably be interpreted only as relating to a specific election or vote. *Id.* at 473-74. For example, the Court mentioned as a consideration the timing element — that is, if an ad "describes a legislative issue that is either currently the subject of legislative scrutiny or likely to be the subject of scrutiny in the near future," it is more likely it should be interpreted as appealing for a vote. *Id.* at 474 (quoting *Wis. Right to Life, Inc. v. FEC*, 466 F. Supp. 2d 195, 207 (D.D.C. 2006)). Human Life itself admits that timing is particularly relevant to its proposed communications; in elaborating on the burden imposed by the Disclosure Law, it stated in its verified complaint that "2008 is an especially vital time for HLW to address the physician-assisted suicide issue because people will again be unusually attentive as it swirls to the forefront of public attention." Given their detailed language and unique timing, the communications proposed by Human Life are certainly express advocacy or its functional equivalent. Moreover, the ads cannot be compared with the communications at issue in *WRTL*, which did not involve an issue that was the subject of an election and merely encouraged voters to engage in communication with their representatives.

**[20]** However, even if Human Life's proposed communications constitute unadulterated issue advocacy, its argument has been foreclosed by the Supreme Court's opinion in *Citizens United*. Considering the possibility of a bright-line rule

distinguishing express and issue advocacy, the Court stated, "[W]e reject Citizen United's contention that the disclosure requirements must be limited to speech that is the functional equivalent of express advocacy." *Citizens United*, 130 S. Ct. at 915. Citing *Buckley*, *MCFL*, and *McConnell*, the Court emphasized the established principle that "disclosure is a less restrictive alternative to more comprehensive regulations of speech," and it recited the list of decisions in which the Court had upheld disclosure requirements under the same principles it used to strike down financial limitations. *Id.* In addition, the Court explained that the distinction between express and issue advocacy that was established by the narrowly construed statutory definitions in cases like *WRTL* did not translate into the disclosure context. The Court explained:

> Citizens United claims that . . . [t]he principal opinion in *WRTL* limited [BCRA's] restrictions on independent expenditures to express advocacy and its functional equivalent. Citizens United seeks to import a similar distinction into BCRA's disclosure requirements. We reject this contention. The Court has explained that disclosure is a less restrictive alternative to more comprehensive regulations of speech.

*Id.* (citations omitted). Given the Court's analysis in *Citizens United*, and its holding that the government may impose disclosure requirements on speech, the position that disclosure requirements cannot constitutionally reach issue advocacy is unsupportable.

In advocating that position, Human Life does no more than reiterate arguments that have been rejected by the Supreme Court. First, in upholding the application of disclosure requirements to electioneering communications, the *McConnell* Court rejected the notion that *Buckley* establishes "a constitutionally mandated line between express advocacy and so-called issue advocacy, and that speakers possess an inviolable

First Amendment right to engage in the latter category of speech." *McConnell*, 540 U.S. at 190; *see also id.* at 193 (rejecting the notion "that the First Amendment erects a rigid barrier between express advocacy and so-called issue advocacy"). The Court found that this notion "misapprehends our prior decisions" because "a plain reading of Buckley makes clear that the express advocacy limitation, in both the expenditure and the disclosure contexts, was the product of statutory interpretation rather than a constitutional command." *Id.* at 190-91. Also, Human Life's expansive reading of *WRTL* as concluding that issue advocacy cannot be subject to disclosure requirements was rejected in *Citizens United*. Thus, imposing disclosure obligations on communicators engaged in issue advocacy is not per se unconstitutional; instead, the constitutionality of the obligations is determined by whether they are substantially related to a sufficiently important governmental interest.

Having dispensed with the idea that only express advocacy and its functional equivalent are subject to government regulation, and that any government regulation of issue advocacy is therefore unconstitutional, we turn to the operative question: whether the Disclosure Law's requirements for "independent expenditures" and "political advertising" are substantially related to Washington State's informational interest. We conclude that they are.

In *Citizens United*, the Supreme Court unreservedly affirmed the public's interest "in knowing who is speaking about a candidate shortly before an election," and it concluded that "the informational interest alone" was sufficient to support federal campaign finance disclosure requirements.[6] *Citi-*

---

[6]Indeed, the *Citizens United* Court recognized not only the public's interest in knowing who is speaking about a candidate, and which donors might wield influence over a candidate, but also the interest of shareholders in determining "whether their corporation's political speech advances the corporation's interest in making profits." *Citizens United*, 130 S. Ct.

*zens United*, 130 S. Ct. at 915-16. Upholding the line of cases that recognize the importance of the government's informational interest, the Court reasoned:

> The First Amendment protects political speech; and disclosure permits citizens and shareholders to react to the speech of corporate entities in a proper way. This transparency enables the electorate to make informed decisions and give proper weight to different speakers and messages.

*Id.* at 916.

As in *Citizens United*, Washington voters' interest in knowing who is speaking about physician-assisted suicide shortly before the vote on a ballot initiative that proposes to legalize that practice is sufficient to support the Disclosure Law's requirements. Under these circumstances, where the "[v]oters act as legislators," *CPLC-I*, 328 F.3d at 1106, the government has a vital interest in providing the public with information about who is trying to sway its opinion. The ability of voters to determine who is behind the advertisements seeking to shape their views is integral to the "full realization of the American ideal of government." *Harriss*, 347 U.S. at 625.

---

at 916. The Court recognized that the value of the information generated by disclosure was not limited to informing voters how to vote, but included providing citizens with the ability "to hold corporations and elected officials accountable for their positions and supporters" and "to react to the speech of corporate entities in a proper way." *Id.*

The reality of this corporate accountability function is illustrated by the public's reaction in August 2010 to a political contribution by Target to an anti-gay gubernatorial candidate. *See* Jia Lynn Yang & Dan Eggen, *Campaign Spending Puts Target in Bull's-Eye*, Wash. Post, Aug. 19, 2010. After disclosure of the contribution sparked an outcry from the gay community, one campaign finance expert suggested that major corporations "are now likely to think twice before giving corporate money to groups that may later prove controversial." *Id.*

Given the complex detail involved in ballot initiatives, and the sheer volume of relevant information confronting voters, voters cannot be expected to make such a determination on their own. Thus, to prevent the public from being misled by special interest groups "masquerading as proponents of the public weal," the voters who passed Washington's Disclosure Law "merely provided for a modicum of information from those" who wish to influence the public's vote. *Id.*; *see also McConnell*, 540 U.S. at 196-97 (noting that groups sometimes use "dubious and misleading names," like "Citizens for Better Medicare," a group funded by the pharmaceutical industry); Editorial, *The Secret Election*, N.Y. Times, Sept. 18, 2010 (noting the ability of 501(c)(4) organizations "with disingenuously innocuous names like American Crossroads and the American Action Network" to serve as "a funnel for anonymous campaign donations"). We have no trouble concluding that Washington's interest in informing the electorate through the Disclosure Law is sufficiently important.

   **[21]** Before analyzing the relationship between the particular burdens imposed by the Disclosure Law and the government interests it furthers, we note that there is less danger of a regulation sweeping too broadly in the context of a ballot measure than in a candidate election. As the district court noted, where a disclosure requirement regulates issue advocacy, the scope of that regulation is naturally "more targeted and limited" when the relevant vote involves a ballot initiative. *Human Life*, 2009 WL 62144, at *18. "Ballot initiatives present a single *issue* for public referendum," and thus the only relevant campaign speech that a disclosure requirement could reach is "speech intended to influence the voter's opinion as to the merits of this single issue — in other words, it is 'issue advocacy,' plain and simple." *Id.* Whereas the broadly defined regulation of campaign speech in the candidate election context "threatens to burden debate on a *broad range* of issues — indeed, any issue that is arguably 'pertinent' to the election," broadly defined speech regulation in the ballot measure context poses a much less significant burden;

in the ballot context, the only issue advocacy that could potentially be regulated is advocacy regarding "the *single* issue put before the public." *Id.* Thus, the potential of the Disclosure Law to incidentally regulate issue advocacy, to which Human Life objects, would engender far more concern if the relevant election involved a candidate. In the ballot initiative context, on the other hand, where express and issue advocacy are arguably "one and the same," any incidental regulation of issue advocacy imposes more limited burdens that are more likely to be substantially related to the government's interests. Because regulation of issue advocacy in the ballot context is virtually indistinguishable from regulation of express advocacy (an admittedly appropriate enterprise), such regulation is more closely related to the government's interest in informing the electorate. We agree with the district court's reasoning that "[f]rom the perspective of the state's compelling interest," it makes little difference whether speech urges the public to vote for or against a ballot measure implicating a particular issue or whether it advocates or attacks that particular issue while the ballot measure is pending.[7]

The particular requirements of Washington's Disclosure Law are substantially related to the government's informational interest in that they target only those expenditures and advertisements made in conjunction with an ongoing election or vote. Reporting requirements do not extend indiscriminately to all issue advocacy conducted at any time — regulating, for example, an advertisement about physician-assisted suicide placed at a time when no related ballot measure is pending. Rather, by definition, disclosure obligations do not apply absent a pending election or ballot initiative campaign. *See* Wash. Rev. Code § 42.17.100(1) (defining "independent expenditure" as an expenditure made to support or oppose a

---

[7]Compare this to a candidate election, where there is a greater distance between speech urging a vote for or against a particular candidate and advocating or attacking one of a "broad range of issues" on which the candidate may have a particular view.

"candidate or ballot proposition"); *id*. § 42.17.020(38) (defining "political advertising" as communications that support or oppose an "election campaign"). Moreover, once the initial two-page registration form is filed, the filing of additional special reports is pegged to the dates of the upcoming election. For independent expenditures, an initial financial disclosure report is required only if certain financial thresholds are passed "during the . . . election campaign," and subsequent reporting requirements, which become due as the date of the vote approaches, arise only if additional expenditures have been made during the campaign period. *Id*. § 42.17.100(2)-(3). Similarly, special reports for political advertising are required only if the advertisement has a fair market value of more than $1,000 and the advertisement is run during the three-week run-up to the vote. *See id*. § 42.17.103(1). All disclosure obligations cease shortly after the relevant vote has taken place. *Id*. § 42.17.100(3).

[22] Thus, under the Disclosure Law, an organization engaging in issue advocacy like Human Life may avoid disclosure requirements any time that the issue about which it is speaking is not the subject of a ballot initiative or other public vote. Once the issue becomes the subject of a ballot initiative campaign, Human Life may continue to advocate all it wants; the only difference is that it must provide certain disclosures at times tied to the date of the vote. Human Life itself recognizes the unique importance of the temporal window immediately preceding a vote. As it stated in its complaint, the year 2008 was "a special opportunity" and "an especially vital time" for it to discuss physician-assisted suicide. It explained that "[b]ecause physician-assisted suicide is now especially in the public awareness and debate, people will be particularly receptive to arguments about the physician-assisted suicide issue." For the same reasons that Human Life had a heightened interest in speaking about physician-assisted suicide during the run-up to the Initiative 1000 vote, Washingtonians had a heightened interest in knowing who was trying to sway their views on the topic and how much they were willing to spend

to achieve that goal. We conclude that the Disclosure Law's requirements for independent expenditures and political advertising are substantially related to that interest.[8]

## C.    Vagueness Challenges

**[23]** "A law is unconstitutionally vague if it fails to provide a reasonable opportunity to know what conduct is prohibited, or is so indefinite as to allow arbitrary and discriminatory enforcement." *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 555 (9th Cir. 2004) (citations omitted); *see also Canyon Ferry*, 556 F.3d at 1030 (finding unconstitutional vagueness where an entity "had no way of knowing *ex ante*" that its conduct would be covered by the challenged statute). "Nevertheless, perfect clarity is not required even when a law regulates protected speech," *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1150 (9th Cir. 2001), and "we can never expect mathematical certainty from our language," *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972). Human Life argues that two terms in the Disclosure Law are unconstitutionally vague: "expectation" as used in the definition of "political committee," and "mass communication" as used in the definition of "political advertising."[9]

---

[8]Human Life also challenges the constitutionality of a separate Washington regulation providing that "[a]ny person making a measurable expenditure of funds to communicate a rating, evaluation, endorsement or recommendation for or against a candidate or ballot proposition shall report such expenditure including all costs of preparation and distribution in accordance with chapter 42.17 RCW." Wash. Admin. Code § 390-16-206. Human Life argues that this regulation is unconstitutional because it uses the phrase "for or against" instead of "expressly for or against." We already have rejected Human Life's argument that issue advocacy is not subject to disclosure requirements. In any event, this regulation does not create new disclosure requirements, but rather clarifies that certain communications — including newspaper editorials and news commentaries — are exempt from the Disclosure Law's requirements. *See id.* (cross-referencing Wash. Rev. Code § 42.17.020(15)(b)(iv), (21)(c); Wash. Admin. Code §§ 390-16-313 (2)(b), 390-05-290).

[9]Throughout its briefs, Human Life argues that various Disclosure Law provisions are "vague and overbroad." With the exception of the two

Although vagueness challenges based on a statute's failure to provide the "reasonable opportunity to know what conduct is prohibited" are generally brought where criminal sanctions may be imposed, *see Buckley*, 424 U.S. at 40-41, the Supreme Court has also held that "[b]ecause First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity," *NAACP v. Button*, 371 U.S. 415, 433 (1963) (considering a vagueness challenge to a state supreme court's declaratory judgment, which defined the purview of state laws prohibiting certain solicitations of legal business); *see also Grayned*, 408 U.S. at 109 (considering a vagueness challenge where the appellant was fined $25 for violations of antipicketing and antinoise ordinances, and stating that "where a vague statute 'abut[s] upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of [those] freedoms' " (alterations in original) (footnotes and citations omitted)).[10]

_____

terms discussed in this section (i.e., "expectation" and "mass communication"), Human Life's arguments center on the asserted overbreadth of the Disclosure Law's provisions, not their vagueness. This approach is not unusual. *See Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983) ("[W]e have traditionally viewed vagueness and overbreadth as logically related and similar doctrines."); *Cal. Teachers Ass'n*, 271 F.3d at 1151 ("A statute's vagueness exceeds constitutional limits if its deterrent effect on legitimate expression is both real and substantial, and if the statute is not readily subject to a narrowing construction by the state courts." (alterations and internal quotation marks omitted)). We already have addressed Human Life's "overbreadth" arguments above insofar as we have held that the definitions of "independent expenditure" and "political advertising" do not burden more speech than is constitutionally permissible under exacting scrutiny. In this section, we address the two statutory terms that Human Life specifically challenges on vagueness grounds.

[10]The Disclosure Law imposes civil penalties for violations, Wash. Rev. Code § 42.17.390, and does not preclude criminal sanctions where appropriate, *see State v. Conte*, 154 P.3d 194, 198 (Wash. 2007).

### 1. "Expectation"

**[24]** An entity qualifies as a "political committee" if it has "the expectation" of spending or receiving money to support or oppose a candidate or ballot initiative. Wash. Rev. Code § 42.17.010. Human Life argues that the word "expectation" is unconstitutionally vague, as it could be interpreted to mean anything from a "hope" to a "contract." We disagree. The meaning of the word "expectation" for the purposes of the Disclosure Law's definition of "political committee" has been clarified through judicial interpretation. First, as discussed above, an entity becomes a political committee under the Disclosure Law's "expenditures" prong if one of its primary purposes is political advocacy. *See Evergreen Freedom Found.*, 49 P.3d at 902-03. Once an entity demonstrates sufficient political activity to qualify under this standard, there can be little doubt that it will "expect" to make expenditures related to that political activity. Second, an entity becomes a political committee under the "contributions" prong if the entity has given the public "actual or constructive knowledge that the organization is setting aside funds to support or oppose a candidate or ballot proposition." *Id.* at 904. Arguably, an organization would not notify the public that funds would be used for political advocacy if the organization did not expect to receive funds for that purpose. Because the "primary purpose" test and "actual or constructive knowledge" test graft into the word "expectation" the concrete, discernible criteria necessary to prevent arbitrary and discriminatory enforcement, we conclude that the term "expectation" is not unconstitutionally vague.

### 2. "Mass Communication"

**[25]** "Political advertising" for purposes of the Disclosure Law encompasses newspaper advertisements, billboards, signs, letters, "or other means of mass communication." Wash. Rev. Code § 42.17.020(38). Human Life argues that the phrase "other means of mass communication" is unconsti-

tutionally vague because it is impossible to determine how broadly distributed a communication must be to fall within the ambit of the statute.

However, "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications.' " *Hill v. Colorado*, 530 U.S. 703, 733 (2000) (quoting *United States v. Raines*, 362 U.S. 17, 23 (1960)). Moreover, "otherwise imprecise terms may avoid vagueness problems when used in combination with terms that provide sufficient clarity," *Gammoh v. City of La Habra*, 395 F.3d 1114, 1120 (9th Cir. 2005), and vagueness challenges will be rejected when it is "clear what the ordinance as a whole prohibits," *Grayned*, 408 U.S. at 110.

**[26]** "When Congress does not define a term in a statute, we construe that term according to its ordinary, contemporary, common meaning." *United States v. Kilbride*, 584 F.3d 1240, 1257 (9th Cir. 2009) (quoting *United States v. W.R. Grace*, 504 F.3d 745, 755 (9th Cir. 2007)). "Mass" is defined as "[d]irected at or reaching a large number of people." Webster's II New Riverside Dictionary (1984). "Communication" is defined as "[t]he exchange of ideas, messages, or information, as by speech, signals, or writing" or "[a] system for sending and receiving messages, as by mail, telephone, or television." *Id.* The only communication proposed by Human Life not expressly covered by the definition of "political advertising" is its planned telemarketing campaign.[11] We conclude that this campaign clearly falls within the ordinary meaning of "mass communication" and that there is no reason to believe that the scope of that term will be overly vague "in the vast majority of its intended applications." Moreover, given the lengthy list of other similar covered communica-

---

[11]Human Life's proposed letters and radio ads are clearly covered by the statute's enumeration of "letters" and "radio or television presentations" as political advertisements. *See* Wash. Rev. Code § 42.17.020(38).

tions, as well as the clear purposes of the Disclosure Law, we find that it is sufficiently evident which communications will be subject to the Disclosure Law's requirements for political advertising. For these reasons, we reject Human Life's contention that "mass communication" is unconstitutionally vague.

## D.    As-Applied Challenges

In addition to its facial challenges, Human Life challenges the Disclosure Law as applied to Human Life and its proposed advocacy activities. However, it does so in name only. Human Life does not provide any evidence to support an as-applied challenge, and it does not distinguish between its facial and as-applied claims in its briefs. It does not, for example, explain how the Disclosure Law impinges upon its associational freedoms. *See, e.g.*, *Citizens United*, 130 S. Ct. at 914 (citing *Buckley*, 424 U.S. at 74) (recognizing that the reasonable probability of harassment as a result of disclosure may be an undue burden on First Amendment rights). Nor does it offer any support for its assertion that Human Life, by its nature, is unable to comply with the Disclosure Law's requirements. *See, e.g.*, *MCFL*, 479 U.S. at 255 (noting that compliance with the federal corporate segregated fund requirements would essentially require MCFL "to assume a more sophisticated organizational form"). Also, as noted above, some of Human Life's proposed communications, which explicitly reference Initiative 1000, constitute "express advocacy" that would be subject to disclosure requirements even if we accepted all of Human Life's constitutional theories.

The factual basis for Human Life's as-applied challenge is to be found, if anywhere, in Human Life's "verified complaint" — its only evidentiary submission. Not only is the complaint devoid of information from which we could conclude that the Disclosure Law is unconstitutional as applied to Human Life, it is not clear from the record that the complaint

was verified by a Human Life official with personal knowledge of the facts alleged therein. *See CPLC-II*, 507 F.3d at 1176 (explaining that a verified complaint may serve as an affidavit for purposes of summary judgment if it is based on personal knowledge and sets forth the requisite facts with specificity). Insofar as there is any evidence at all to support an as-applied challenge, that evidence is disputed given the Commission's evidentiary submissions, which show that Human Life already has in place many of the organizational features required of political committees under the Disclosure Law, and that the reporting requirements imposed by the Disclosure Law are quite modest. The Commission also points out that it has in place procedures by which organizations may obtain guidance on their obligations under the Disclosure Law and that Human Life has not sought any assistance. Any conflicts in the evidence as to Human Life's activities or the severity of the burden imposed on them preclude summary judgment in Human Life's favor. *See* Fed. R. Civ. P. 56.

**[27]** In essence, Human Life's as-applied argument goes to the relief requested: We understand Human Life's position to be that, if we conclude that the Disclosure Law is unconstitutional on its face, then we should require the district court to enter an injunction specifying that its disclosure requirements cannot be enforced against Human Life or its proposed advocacy activities. Because we conclude that the Disclosure Law is constitutional on its face, we decline to do so.

## CONCLUSION

In his first inaugural address, Thomas Jefferson argued that information is a precondition for public debate, which, in turn, is a precondition for democratic self-governance: "The diffusion of information and the arraignment of all abuses at the bar of public reason, I deem [one of] the essential principles of our government, and consequently [one of] those which ought to shape its administration." Thomas Jefferson, First Inaugural Address, 1801; *see also Nixon v. Shrink Mo. Gov't*

*PAC*, 528 U.S. 377, 411 (2000) (Thomas, J. dissenting) ("Our Founders sought to protect the rights of individuals to engage in political speech because a self-governing people depends upon the free exchange of political information."). Consistent with Jefferson's vision, disclosure requirements have become an important part of our First Amendment tradition. *See, e.g.*, *Reed*, 130 S. Ct. at 2818; *Citizens United*, 130 S. Ct. at 908; *Harriss*, 347 U.S. at 625. The Disclosure Law represents Washingtonians' considered judgment that "full access to information concerning the conduct of government on every level must be assured as a fundamental and necessary precondition to the sound governance of a free society." Wash. Rev. Code § 42.17.010(11). There is a substantial relationship between Washington State's interest in informing the electorate and the definitions and disclosure requirements it employs to advance that interest. Accordingly, the judgment of the district court is **AFFIRMED.**